No. 106,318

STATE OF KANSAS, *Appellee*, v. ALEJANDRO E. BETANCOURT, JR., *Appellant*.

(322 P.3d 353)

Opinion filed April 11, 2014.

*Michelle A. Davis*, of Kansas Appellate Defender Office, argued the cause and was on the brief for appellant.

*Boyd K. Isherwood*, chief appellate attorney, argued the cause, and *Nola Tedesco Foulston*, district attorney, and *Derek Schmidt*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

ROSEN, J.: Alejandro E. Betancourt, Jr., appeals from his conviction of first-degree murder and criminal discharge of a firearm at an occupied building. Finding no reversible error, we affirm.

In May 2010, Daniel Betancourt was involved in an altercation at an apartment building on West 21st Street in Wichita that resulted in his hospitalization. Luis Guerrero-Lopez was associated with the assailants, and Guerrero-Lopez was at the time romantically involved with Maribel Andrade, who lived at a residence on North Jackson Avenue with her mother and brothers. Daniel is the brother of the defendant, Alejandro.

Gregory Patton was a friend of Alejandro and Daniel's brother, Eli Betancourt. On June 19, 2010, Patton and Eli got together and went to a birthday party at a friend's house. Eli drove them there in his green Jeep at around 10:30 in the evening. Alejandro was already at the party when they arrived. Eli, Alejandro, and Patton all consumed alcohol at the party. At some point in time during the party, a man in a red jersey, who was later identified as Edward Laurel, was overheard saying that he knew where the individual who had been involved in the incident with Daniel lived. Alejandro, Eli, and Patton left the party together sometime shortly before sunrise. Eli was driving, and Alejandro sat in the passenger seat, with Patton sleeping part of the time in the back.

Patton woke up when they pulled up in front of a house that was unfamiliar to him. Patton saw Eli, Alejandro, Laurel, and an unfamiliar Hispanic man talking in the front yard. Eli, Alejandro, and Laurel got back in the Jeep, with Alejandro driving. Laurel and Patton sat in the back seat, while Eli sat in the front passenger seat. Laurel explained that he was going to get back at somebody. He gave directions on how to get to a house on North Jackson Avenue. Alejandro slowly drove the car by the house when they arrived, parking just out of sight of the residence. Laurel was hold-

ing a semiautomatic gun and explained that the plan was to run up to the house and shoot into it.

Alejandro told Eli and Laurel to run back to the car when they had finished their mission. Eli and Laurel got out of the Jeep and walked toward the house. Alejandro told Patton, "Listen for it." They heard gunshots, and, after a few minutes, Alejandro backed the car up when Eli and Laurel failed to reappear. Alejandro saw that the two gunmen were running the wrong way, so he drove the car around the block to meet them and pick them up. Laurel said as he got in the car, "I got him," and Alejandro drove the car away at a high speed.

Eli and Laurel fired at least 15 shots into the house, using a .22 caliber firearm and a 9 mm firearm. An examination of damage to the front doors indicated that someone had held the screen door open and had fired shots directly into the main door.

That night, 13-year-old Miguel Andrade, the younger brother of Maribel, had stayed up late watching television and had gone to sleep on the living room sofa. Around 6 in the morning, his mother heard a loud bang and then heard Miguel shouting in Spanish that he had been hit. She went into the living room, where she found Miguel lying on the floor by the front door. She initially thought someone had hit Miguel with a fist, but then he said, "They shot me." She saw blood on him, and she called 911 and began shouting out a window to neighbors. Miguel was taken to a hospital by ambulance, where he died from multiple gunshot wounds.

Neighbors who observed the scene were able to describe what happened and give descriptions of the two gunmen. They saw two Hispanic men walk up to the house, where one of the men either knocked on the door or rang the doorbell while the other looked in through a window. The two started shooting at the door when it appeared that someone inside the house was approaching the door. A neighbor across the street had set up motion-sensitive security cameras to help safeguard construction materials on his property, and at about 6 in the morning the cameras recorded a vehicle resembling Eli's Jeep slowly driving by the house several times before it finally parked.

After leaving the scene of the shooting, Alejandro drove back to the house where he and the others had initially met up with Laurel. Laurel took the guns and got out of the Jeep, and Eli took over driving from Alejandro. Police intercepted the Jeep soon afterwards, and several eyewitnesses identified Eli as one of the shooters.

The State filed an information charging Alejandro with one count of premeditated first-degree murder, or, in the alternative, one count of felony first-degree murder, and one count of criminal discharge of a firearm at an occupied building. A jury found Alejandro guilty of first-degree murder under both theories and guilty of criminal discharge of a firearm.

On May 13, 2011, the court sentenced Alejandro to a hard 25 life sentence for murder and a consecutive 17-month sentence for the criminal discharge of a firearm. Alejandro filed a timely appeal to this court.

*Jury Instructions With Respect to Intent*

In order to be guilty of aiding and abetting, " 'a defendant must willfully and knowingly associate himself with the unlawful venture and willfully participate in it as he would in something he wishes to bring about or to make succeed.' " *State v. Llamas*, 298 Kan. 246, 253, 311 P.3d 399 (2013) (quoting *State v. Schriner*, 215 Kan. 86, 92, 523 P.2d 703 [1974]). "[W]hen a person knowingly associates with an unlawful venture and participates in a way that demonstrates willful furtherance of its success, guilt as an aider and abettor is established. [Citations omitted.]" *State v. Herron*, 286 Kan. 959, 968, 189 P.3d 1173 (2008).

Jury Instruction 7 explained aiding and abetting:

"A person who, either before or during its commission, intentionally aids another to commit a crime with intent to promote or assist in its commission is criminally responsible for the crime committed regardless of the extent of the defendant's participation, if any, in the actual commission of the crime."

Jury Instruction 8 explained premeditated murder:

"The defendant is charged with the crime of first degree murder. The defendant pleads not guilty. To establish this charge, each of the following claims must be proved:

"1. That the defendant intentionally killed Miguel Andrade;

"2. That such killing was done with premeditation;

"3. That this act occurred on or about the 20th day of June, 2010, in Sedgwick County, Kansas.

. . . .

"Intentionally means conduct that is purposeful and willful and not accidental. Intentional includes the terms 'knowing', 'willful', 'purposeful' and 'on purpose.' "

Alejandro argues on appeal that these instructions were deficient because they did not inform the jury that a defendant who is guilty on an aiding and abetting theory of premeditated murder must share the principal's premeditated intent. Alejandro did not object to the instructions on premeditated murder. This court therefore applies a clear-error rule. See *State v. Dobbs*, 297 Kan. 1225, 1237, 308 P.3d 1258 (2013). In determining whether an instruction was clearly erroneous, this court first determines whether the instruction was erroneous, which is a legal question subject to de novo review. If the instruction was erroneous, the court then determines whether it is firmly convinced that the jury would have reached a different verdict without the error, in which case reversal is required. Reversibility is subject to unlimited review and is based on the entire record. It is the defendant's burden to establish clear error under K.S.A. 22-3414(3). 297 Kan. at 1237.

Alejandro refers to language contained in *State v. Overstreet*, 288 Kan. 1, 200 P.3d 427 (2009), where the trial court provided a dual instruction on aiding and abetting:

" 'A person who, either before or during its commission, intentionally aids, abets or procures another to commit a crime with the intent to promote or assist in its commission, is criminally responsible for the crime committed regardless of the extent of the person's participation, if any, in the actual commission of the crime.

" 'A person who intentionally aids another to commit a crime is also responsible for any other crime committed in carrying out or attempting to carry out the intended crime, if the other crime was reasonably foreseeable.' " 288 Kan. at 8.

The court followed *State v. Engelhardt*, 280 Kan. 113, 119 P.3d 1148 (2005), and held that the two-part instruction impermissibly lowered the State's burden of proving the element of intent because the instruction stated that the prosecution was required only to prove that the murder was a foreseeable consequence of another

criminal act—not that the murder was premeditated. *Overstreet*, 288 Kan. at 10-11. The court noted that in *Engelhardt* the conviction based on the same instruction was affirmed because of the overwhelming evidence against the defendant. 288 Kan. at 11. The *Overstreet* court held, however, that the foreseeability part of the instruction inaccurately stated the law and could have confused the jury on the subject of intent. 288 Kan. at 14-15.

Alejandro pulls from *Overstreet*, 288 Kan. 1, the second and third syllabus paragraphs to support his argument that the instruction was incomplete:

"2. For a defendant to be convicted of a specific intent crime on an aiding and abetting theory, that defendant must have the same specific intent to commit the crime as the principal."

"3. The specific intent required to be proved for conviction on a premeditated first-degree murder charge is premeditation. Therefore, under K.S.A. 21-3205(1), a person guilty of aiding and abetting a premeditated first-degree murder must be found, beyond a reasonable doubt, to have had the requisite premeditation to murder the victim."

Alejandro's case differs significantly from *Overstreet* and *Engelhardt* in that the second part of the aiding and abetting instruction—the part negating the intent portion—was not given here. Instead, in this case the jury was given Instructions 7 and 8, which explicitly required the jury to find that Alejandro intended to aid and abet in a killing done with premeditation. See *Llamas*, 298 Kan. at 261 (when reviewing for error, appellate courts examine instructions as a whole, rather than any one isolated instruction, and appropriately consider the elements instruction together with the aiding and abetting instruction). Considering the entirety of the jury instructions, we conclude that the instructions as given accurately stated Kansas law and did not mislead or confuse the jury.

*Aiding and Abetting as Alternative Means*

Alejandro argues on appeal that committing murder as the principal and committing murder as an aider and abettor constitute two alternative means for committing first-degree murder. Because the State presented no evidence tending to prove that Alejandro

actually fired a weapon, he argues that there was insufficient evidence to support a conviction under one of the alternative means, and it is impossible to determine whether the jury was unanimous in finding him guilty only under the theory of aiding and abetting.

Whether a statute creates alternative means of committing a crime is a matter of statutory interpretation and construction and is a question of law subject to de novo review on appeal. *State v. Foster*, 298 Kan. 348, 353, 312 P.3d 364 (2013) .

In *State v. Brown*, 295 Kan. 181, 194, 284 P.3d 977 (2012), we held that alternative means are legislatively determined distinct, material elements of a crime, as opposed to legislative descriptions of material elements or factual circumstances that would prove the crime. We explained:

"The listing of alternative distinct, material elements, when incorporated into an elements instruction, creates an alternative means issue demanding super-sufficiency of the evidence. But merely describing a material element or a factual circumstance that would prove the crime does not create alternative means, even if the description is included in a jury instruction. [Citation omitted.]" 295 Kan. at 194.

The present case calls for an unusual analysis of the alternative means problem. Unlike the challenge in a typical alternative means case, Betancourt does not argue that a disjunctive "or" in the language of a particular statute creates two criminal acts, both of which the State must prove. Instead, Betancourt maintains that two separate statutes, when applied together, create two criminal acts, with a concurrent burden on the State to prove both. Our inquiry is whether the aiding and abetting statute adds distinct, material elements to the crime of first-degree murder, or whether it is a factual circumstance that would prove the crime. See *Brown*, 295 Kan. at 193 (identifying alternative means issues more complicated than simply finding word "or").

K.S.A. 21-3401 defines first-degree murder:

"Murder in the first degree is the killing of a human being committed:
  "(a) Intentionally and with premeditation; or
  "(b) in the commission of, attempt to commit, or flight from any inherently dangerous felony."

K.S.A. 21-3205 defines liability for crimes committed by another:

"(1) A person is criminally responsible for a crime committed by another if such person intentionally aids, abets, advises, hires, counsels or procures the other to commit the crime.

"(2) A person liable under subsection (1) hereof is also liable for any other crime committed in pursuance of the intended crime if reasonably foreseeable by such person as a probable consequence of committing or attempting to commit the crime intended.

"(3) A person liable under this section may be charged with and convicted of the crime although the person alleged to have directly committed the act constituting the crime lacked criminal or legal capacity or has not been convicted or has been acquitted or has been convicted of some other degree of the crime or of some other crime based on the same act."

Alejandro argues that the elements contained in the aiding and abetting statute add material elements to the definition of the crime. Applying Alejandro's rationale, the aiding and abetting statute, standing alone, would not apply to Laurel, for example, because he did not aid the others in committing the crime. Similarly, the first-degree murder statute, standing alone, would not apply to Alejandro, because he did not kill anyone. Alejandro reasons that the elements of the two theories of guilt are different, and the State failed to prove both theories.

This argument has at least two shortcomings. First, the first-degree murder statute itself does not expressly require that the defendant perform the act resulting in death. Guilt can be predicated on the "killing of a human being," without the actual killer being specified and prosecuted. Second, Laurel did in fact aid the others in committing the crime: All four individuals in the car participated in the killing, and each of the four aided and abetted the three others in carrying out the crime.

Requiring the State to prove which participant in a concerted-effort crime was the principal actor and which was the accessory has the potential to create insoluble problems for a jury. In the present case, for example, the evidence is overwhelming that both Eli and Laurel went to the victim's front door and fired shots through it. It would be virtually impossible for the State to prove that one shooter, or the other shooter, or both, ultimately killed

the victim when both inflicted serious wounds. Furthermore, in order to obtain a proper conviction in a case such as this one, a special verdict might be necessary, because instructing the jury that it could only find the defendant guilty of murder under a theory of aiding and abetting could prove complex and confusing. See *Brown*, 295 Kan. at 196 (criticizing special verdicts); *State v. McDonald*, 138 Wash. 2d 680, 687, 981 P.2d 443 (1999) (rejecting alternative means analysis spares jury potentially impossible task of deciding which of two gunmen actually killed victim).

The more accurate approach is to consider the language of the aiding and abetting statute to be an assignment of criminal responsibility, rather than the creation of a distinct element of a crime. K.S.A. 21-3205 makes a person equally liable for crimes of others if there is a concerted effort to carry out the crime. It does not, for instance, establish two different crimes, one consisting of shooting a victim and the other consisting of handing a gun to someone for the purpose of shooting a victim. Similarly, it does not establish two different crimes for committing a murder, one committed by firing a gun and the other by driving the getaway car. Instead, the legislative intent, as expressed in the language of the aiding and abetting statute, is to make each individual who engages in a concerted action to carry out a crime equally culpable. See *Rosemond v. United States*, 572 U.S. ___, 134 S. Ct. 1240, 1246, 188 L. Ed. 2d 248 (2014) (under both common-law and federal statute, aiding and abetting does not have to advance every element of principal crime).

This approach avoids problems in distinguishing a principal from an accessory. For example, if two individuals enter a store and demand money from the register, and one holds open a bag and the other deposits the money into the bag, then only one crime has been committed. It is not necessary to distinguish which of the perpetrators was the thief and which was the aider and abettor to the thief. See *Rosemond*, 134 S. Ct. at 1246 (citing 1 Wharton, Criminal Law § 251, p. 322 [11th ed. 1912]). As this court explained in *State v. Robinson*, 293 Kan. 1002, 1038, 270 P.3d 1183 (2012), "[a]iding and abetting is not a separate crime in Kansas. Instead it

extends criminal liability to a person other than the principal actor. [Citation omitted.]"

This analysis is also consistent with the position that this court has taken with regard to charging documents. The State is not required to charge aiding and abetting in order to pursue such a theory at trial. If at trial the jury could reasonably conclude that the defendant aided and abetted another in the commission of the crime, it is appropriate to instruct the jury on aiding and abetting. See, *e.g.*, *State v. Amos*, 271 Kan. 565, 23 P.3d 883 (2001); *State v. Pennington*, 254 Kan. 757, 764, 869 P.2d 624 (1994); *State v. Motor*, 220 Kan. 99, 102, 551 P.2d 783 (1976). This is because the statutory scheme explicitly states that one who aids and abets in the commission of any offense may be charged, tried, and convicted in the same manner as if acting as a principal. 220 Kan. at 102.

We are persuaded that murder by shooting a gun and murder by facilitating the shooter are not separate means of committing a shooting crime that require alternative instructions. The legislature has not differentiated between the penalty for aiding and abetting and the penalty for actions as a principal; as this court has previously decided, aiding and abetting does not constitute a separate crime in this state. It does not have to be charged separately prior to trial. Jurors are not required to differentiate among like-minded individuals who jointly carry out a crime, some perhaps by firing deadly shots and others perhaps by driving a getaway car.

We conclude that the jury was properly instructed on the elements of first-degree murder and that sufficient evidence supported the conviction.

Our Court of Appeals has published at least four cases on the issue, with panels taking opposing positions. See, *e.g.*, *State v. Boyd*, 46 Kan. App. 2d 945, 952-53, 268 P.3d 1210 (2011), *petition for rev. filed* January 23, 2012 (aiding and abetting is alternative means); *State v. Cato-Perry*, 48 Kan. App. 2d 92, 284 P.3d 363 (2012), *petition for rev. filed* September 12, 2012 (aiding and abetting is alternative means); *State v. Snover*, 48 Kan. App. 2d 298, 287 P.3d 943 (2012), *petition for rev. filed* December 10, 2012 (no alternative means; statutory language simply sets out degree of cul-

pability as accessory); *State v. Jackson*, 49 Kan. App. 2d 116, 305 P.3d 685 (2013), *rev. denied* 299 Kan. 1272 (2014) (no alternative means; aiding and abetting statute merely provides descriptors of how defendant person participated in crime). We note that the cases finding no alternative means conflict were decided after our ruling in *Brown* and relied on the analysis in *Brown*. To the extent that *Boyd* and other Court of Appeals opinions are inconsistent with our holding in the present matter, those opinions are over-ruled.

*Voluntary Intoxication Instruction*

Alejandro argues that, despite his failure to request a voluntary intoxication instruction, the trial court committed reversible error by failing to give the instruction. Because he did not object to the instructions as given or request an instruction on voluntary intox-ication, this court applies the clear-error rule with the same stan-dard of review as in the first two issues. This court first determines whether the instruction was erroneous, which is a legal question subject to de novo review. If the instruction was erroneous, the court then determines whether it is firmly convinced that the jury would have reached a different verdict without the error, in which case reversal is required. Reversibility is subject to unlimited re-view and is based on the entire record. It is the defendant's burden to establish clear error under K.S.A. 22-3414(3). *Dobbs*, 297 Kan. at 1237.

A defendant is entitled to a voluntary intoxication instruction if there is evidence supporting such a defense. See *State v. Moore*, 287 Kan. 121, 134, 194 P.3d 18 (2008); *State v. Baker*, 281 Kan. 997, Syl. ¶ 2, 135 P.3d 1098 (2006). Unless the State or the de-fendant presents sufficient evidence showing intoxication to the extent of impairing the ability to form the requisite intent, a court is not required to instruct the jury on the defense of voluntary intoxication. *State v. Gadelkarim*, 247 Kan. 505, 508, 802 P.2d 507 (1990). Loss of memory or inability to remember events before or during the offense may show an inability to form intent. See *State v. Minski*, 252 Kan. 806, 811-12, 850 P.2d 809 (1993). Without evidence that the defendant is so impaired that he or she has lost

the ability to reason, to plan, to recall, or to exercise motor skills as a result of voluntary intoxication, it is not clear error to fail to give a voluntary intoxication instruction. *State v. Warren*, 252 Kan. 169, 174, 843 P.2d 224 (1992).

The evidence to which Alejandro points as supporting the instruction comes from the testimony of Detective Dan Harty. Harty testified that during a custodial interview, Alejandro discussed his mental state at the time of the crime:

"And he told me that he was—he was drunk but he was conscious and alert or awake the entire time.

. . . .

"He said: 'I wasn't sleeping, man. I was—I was—I mean I was drunk but I mean I was conscious the whole time. I just—I really honestly wasn't thinking about none of that stuff. I was probably just drinking.'"

Harty also testified that Alejandro told him he had been using cocaine that night and had been drinking well into the party and was "pretty effed up." There was thus substantial evidence that Alejandro had been consuming intoxicants, and there was some limited evidence that he was impaired. It would require expansive understanding of that evidence, however, to find within it substantive indicators that Alejandro was so intoxicated that he was unable to form a specific intent to commit the crimes.

In fact, the evidence showed that Alejandro possessed sufficient mental function to drive the perpetrators to the scene of the crime, drive by the house several times, pull the car up to where it would not be seen from the house, direct the gunmen on their escape activities, back up to check on what was happening, observe that the shooters were running the wrong way and drive around the block to pick them up, and then drive away from the scene at a high rate of speed.

In his closing argument, defense counsel mentioned that Alejandro was "conscious" but that he was "messed up," high," and "drunk." Defense counsel never argued to the jury, however, that Alejandro was so intoxicated that he was unable to form the intent to participate in a shooting. The defense argued instead that the four did not intend to engage in any gunfire but were startled when someone came to the door after they knocked. Defense counsel

also argued that Alejandro was not aware that guns were going to be part of the picture when they got to the house.

Although Alejandro's consumption of intoxicants was introduced, it was never emphasized or shown to have impaired his ability to form the intent to aid and abet a murder. It was therefore not error, let alone clear error, to omit an instruction on voluntary intoxication.

*Juror's Statement During Voir Dire*

Before the trial, the State filed a motion to admit evidence of gang membership as defined in K.S.A. 21-4226. Alejandro subsequently filed a motion in limine asking the court to exercise control over witnesses to prevent jurors from learning about possible gang associations with the homicide. The trial court denied the State's motion and granted Alejandro's motion in limine.

During voir dire, the following dialogue took place between the prosecutor and a prospective juror:

"[PROSECUTOR]: [K.G.], I saw you raise your hand. You have knowledge of this case?

"[PROSPECTIVE JUROR]: Uh-huh.

"[PROSECUTOR]: And how—what's your knowledge?

"[PROSPECTIVE JUROR]: I actually volunteer at Big Brothers Big Sisters and my Little Sister, this was a family member of theirs, the child was.

. . . .

"[PROSECUTOR]: Did your sister tell you anything about the case that you didn't read in the newspaper, anything like that?

"[PROSPECTIVE JUROR]: Her mother filled me in on how the family was doing and things like that. They told me that it's gang related, things like that. But—yeah. That's—

"[PROSECUTOR]: Do you think you would be able to set aside your opinions on this case, the information you have, and just listen to what the actual physical evidence is?

"[PROSPECTIVE JUROR]: Yes."

Subsequent questions were then directed to the venire on their independent knowledge of the case, with no reference made to gang associations.

Shortly afterwards, defense counsel made an oral motion for mistrial based on a violation of the earlier order and because the jury panel was allegedly tainted. The court denied the motion for

three reasons: The court had not yet issued a final ruling on gang evidence; the jurors all had stated that they could base their decision on the evidence before them and not on outside sources; and a limiting instruction could be given at the conclusion of the evidentiary presentation.

K.S.A. 22-3423(1)(c) allows a trial court to declare a mistrial if prejudicial conduct occurred within the courtroom that makes it impossible for the trial to proceed without injustice. The statute creates a two-step process for the trial court. First, the court must determine whether there was some fundamental failure in the proceeding, and, if so, it then must determine whether it is possible to continue the trial without injustice. *State v. Race*, 293 Kan. 69, 80, 259 P.3d 707 (2011).

On appeal, a motion for mistrial is reviewed under an abuse of discretion standard. *State v. Leaper*, 291 Kan. 89, 96, 238 P.3d 266 (2010). A trial court abuses its discretion if its action (1) is arbitrary, fanciful, or unreasonable; in other words, if no reasonable person would have taken the view adopted by the trial court; (2) is based on an error of law; in other words, if the discretion is guided by an erroneous legal conclusion; or (3) is based on an error of fact; in other words, if substantial competent evidence does not support a factual finding on which a prerequisite conclusion of law or the exercise of discretion is based. See *State v. Brown*, 295 Kan. 181, 206, 284 P.3d 977 (2012).

When making the determination that error was harmless in the context of a violation of statutory evidentiary limitations, this court applies the harmless error standard of K.S.A. 60-261 and K.S.A. 60-2105 to determine whether a reasonable probability exists that the error affected the outcome of the trial in light of the record as a whole. The State, as the party benefitting from the introduction of the evidence, has the burden of persuading the court that the error was harmless. *State v. Warrior*, 294 Kan. 484, 513, 277 P.3d 1111 (2012).

It should be noted that this is not an instance of alleged prosecutorial misconduct. The prosecutor's question was open-ended and fair; the prospective juror's comment about gang involvement was spontaneous and was not specifically solicited. The prosecutor

did not dwell on that part of the answer, and the prosecutor did not argue to the jury that gang violence was a factor in the homicide.

Cases dealing with similar situations in other jurisdictions are instructive.

In *United States v. Howard*, 216 Fed. Appx. 463, 473 (6th Cir. 2007), a prospective juror announced during voir dire that he would not believe a certain witness "if he laid his hands on a stack of bibles" based on prior dealings with the witness. The defense immediately moved for a mistrial. The district court questioned the jurors remaining after strikes for cause and made general inquiries about their inclination to evaluate the veracity of witnesses based on the opinions voiced by other jury members. The court also cautioned the jury panel not to give any particular witness more or less credibility based on the voir dire proceedings. The Court of Appeals affirmed the district court's decision to deny the motion for a mistrial, applying an abuse of discretion standard. The Sixth Circuit Court of Appeals noted that the jury panel indicated that it was not prejudiced by the prospective juror's statement and the witness' testimony was not "pivotal" to the case. 216 Fed. Appx. at 473-74.

In *State v. Taito*, No. CAAP-12-0000185, 2013 WL 2908670 (Hawaii App. 2013) (unpublished opinion), the court found no prejudicial error requiring a mistrial based on remarks made by a single prospective juror during voir dire. The court noted that the juror was excused from the panel and that the defendant failed to point to any evidence that the impaneled jurors were tainted by the comments or did not comply with the district court's instructions.

In *State v. Harrison*, 743 So. 2d 883, 888 (La. App. 1999), two prospective jurors referred to a crime problem in the area and one juror said that he had heard that the defendant "was back in jail." Because the prosecution did not invite the comments, no mandatory mistrial was in order, and because there was no demonstrated prejudice, no discretionary mistrial was appropriate. The court noted that mistrial is a drastic remedy lying within the sound discretion of the trial court, and it is a remedy that should be applied

only if substantial prejudice would otherwise result. 743 So. 2d at 889.

In *State v. Price*, 104 N.M. 703, 708, 726 P.2d 857 (1986), the court held that when a juror makes a spontaneous comment in open court, the defendant has the burden of demonstrating prejudice. A juror's comment that may be improper does not necessarily demonstrate bias by that juror and does not necessarily lead to the conclusion that other jurors were prejudiced by the comment. 104 N.M. at 708.

In *State v. Sanders*, 92 Ohio St. 3d 245, 750 N.E.2d 90 (2001), a prospective juror made a comment during voir dire that the defendant reminded him of Louis Farrakhan, whom he regarded as anti-white and anti-American. Both the district court and the appellate court declined to find prejudice to the remainder of the jury panel, largely because the defense failed to ask the court to question the other panel members about the effect of the comment on their ability to act impartially. 92 Ohio St. 3d at 249. The court found no inherent prejudice when the prospective juror gave only personal opinions and did not speak at length on the subject. 92 Ohio St. 3d at 248.

In the present case, the juror mentioned gang involvement only in passing, and the topic was not brought up again. The defense did not ask for permission to conduct an examination of the jury for prejudice and did not request an instruction directing the jury to disregard unsworn statements by jury members. Furthermore, the defense did not seek to strike the juror in question for cause. This case thus resembles those cases from other jurisdictions finding no reversible error based on prejudice to other jury members. The trial court did not abuse its discretion in denying Alejandro's motion for a mistrial.

*Cumulative Error*

When a party argues that the cumulative impact of alleged errors is so great that they result in an unfair trial, this court aggregates all errors and, even if those errors individually would be considered harmless, analyzes whether their cumulative effect is so great that they collectively cannot be determined to be harmless. *State v.*

*King,* 297 Kan. 955, 986, 305 P.3d 641 (2013). In undertaking such an analysis, this court reviews the entire record and exercises unlimited review. *State v. Cruz,* 297 Kan. 1048, 1074, 307 P.3d 199 (2013). Because we determine that no errors were committed, the cumulative error doctrine does not apply. See *State v. Lowrance,* 298 Kan. 274, 298, 312 P.3d 328 (2013).

Affirmed.