NOT DESIGNATED FOR PUBLICATION

No. 116,522

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

BRADY FORD TOOLE,
*Appellant*.

MEMORANDUM OPINION

Appeal from Bourbon District Court; MARK ALAN WARD, judge. Opinion filed December 15, 2017. Affirmed.

*Randall L. Hodgkinson*, of Kansas Appellate Defender Office, for appellant.

*Amanda G. Voth*, assistant solicitor gerneral, and *Derek Schmidt*, attorney general, for appellee.

Before GARDNER, P.J., GREEN, J, and MERYL D. WILSON, District Judge, assigned.

PER CURIAM: Brady Ford Toole was charged with multiple counts of rape and aggravated indecent liberties with a child based upon alleged inappropriate touching of his niece who was seven years old at the time the alleged touching occurred. A jury convicted Toole of the one count of aggravated indecent liberties and acquitted him on five counts of rape. On appeal, Toole alleges two jury instruction errors: (1) the definition of lewd was legally inappropriate; and (2) a unanimity instruction for the aggravated indecent liberties charge was necessary. Toole also argues that the district court erred in admitting photographs of a text message conversation between Toole's

mother and the victim's mother. Finally Toole claims cumulative error requires reversal. Finding no error, we affirm.

A.B. was adopted by Tamai and her family in 2003 when A.B. was 3 years old. In December 2013, A.B. told Tamai that her cousin Brady Toole had molested her multiple times in the fall of 2007 when A.B. was 7 years old. A.B. had come home from school crying and informed Tamai that Toole had raped her. Toole had been living with her family during the fall of 2007 until December 2007 in order to continue playing soccer on his high school team. A.B. did not immediately disclose the abuse she suffered because she was scared and did not know what to do.

Tamai attempted to contact Toole about the allegation, but he did not respond. Tamai then contacted her sister, Toole's mother, Teresa O'Neal. The two conversed over text message about the allegations. O'Neal talked to Toole about the allegations, and Toole told her that he touched A.B. but there was no penetration.

Tamai informed the police of the alleged inappropriate contact, and they investigated the alleged crime. Part of this investigation involved interviewing A.B. The police also interviewed O'Neal and photographed the text message conversation on Tamai's phone between her and O'Neal. O'Neal provided a statement to the police that Toole had told her that he had touched her one time in her bedroom with his penis and fingers, but there was no penetration.

The State charged Toole with six counts of rape and four counts of aggravated indecent liberties with a child. At trial, A.B. testified about six distinct events of inappropriate touching that occurred. The first event occurred in her bedroom when Toole entered her bedroom, removed her pants and underwear, and began rubbing her vaginal area. The second event took place while A.B. was napping. Toole removed her pants, rubbed her vagina, and inserted his penis into A.B.'s vagina. During this incident,

2

Toole told A.B. to kiss him and she did. For the third incident, A.B. was on a couch and Toole took off her pants, rubbed her vaginal area, and inserted his penis into her. The fourth incident occurred in the bathroom when Toole laid her on the floor, touched her vaginal area, and inserted his penis. The fifth incident also occurred in the bathroom when Toole inserted his fingers into A.B.'s vagina. The sixth and final incident occurred in a bedroom when Toole pulled down A.B.'s pants, rubbed her vaginal area, and inserted his penis. After this final event, A.B. threatened to tell on Toole if he did not stop. Toole allegedly bribed A.B. with a cell phone and money, but A.B. did not take the bribe. Toole moved out of the house shortly after A.B. told him to stop.

The text message conversation between Tamai and O'Neal was admitted into evidence over Toole's objection for foundation and hearsay. In the message O'Neal states that Toole told her "some things did happen but there was ABSOLUTELY no penetration!" O'Neal provided a consistent written statement to the police—that Toole admitted to touching A.B. but denied any penetration. At trial, O'Neal contradicted her previous statements alleging that they were false due to her being on sleeping medication at the time they were given. However, the police officer who conducted the interview stated that O'Neal did not appear to be under the influence of any substance at the time she gave her statement. O'Neal also stated that Toole denied ever touching A.B. and that Toole never lived with Tamai or A.B.

At the close of the State's evidence, Toole moved for a judgment of acquittal on all charges. The district court granted the motion in part and denied it in part. The court determined the State had presented a prima facie case for five counts of rape and one count of aggravated indecent liberties with a child based upon A.B.'s testimony.

While the State alleged that all these events occurred while Toole lived in the same house as A.B., Toole's defense was that he never lived in the house with A.B. and did not inappropriately touch A.B. Toole testified at trial and denied having any

3

inappropriate contact with A.B. and asserted that he did not live with Tamai or A.B. However, on cross-examination the State presented evidence that Toole did not provide the address where he claimed to be living on a security clearance form for the United States Air Force. Toole also presented various witnesses that testified that he did not live with Tamai's family during the time the events took place.

Ultimately, the jury convicted Toole of the one count of aggravated indecent liberties with a child and acquitted Toole of all five counts of rape. The district court imposed a 59-month prison sentence followed by 60 months of postrelease supervision. Toole timely filed a notice of appeal.

*Did the court err by including language about the defendant's mental state in the definition of lewd for the aggravated indecent liberties with a child charge?*

Toole challenges the jury instruction for aggravated indecent liberties with a child. In analyzing claims of jury instruction error, the court must determine whether the question is properly before the court. In other words, the court determines whether there is either a lack of jurisdiction and if the question was properly preserved at the lower court. See *State v. Williams*, 295 Kan. 506, 517, 286 P.3d 195 (2012). An error that is not properly preserved is reviewed for clear error. K.S.A. 2016 Supp. 22-3414(3).

There was no objection raised to this jury instruction at the district court; thus, Toole's alleged error is reversible only if the error is clearly erroneous. In reviewing for clear error, first the court must determine whether the instruction was erroneous. This is a legal question subject to de novo review. *State v. Betancourt*, 299 Kan. 131, 135, 322 P.3d 353 (2014). To determine whether a jury instruction was erroneous, this court analyzes whether the instruction was legally and factually appropriate. See *State v. Plummer*, 295 Kan. 156, 168, 283 P.3d 202 (2012). Toole challenges whether the instruction was legally appropriate.

4

Under the clearly erroneous standard, if the court determines the instruction was erroneous, reversal is required if the court is firmly convinced the jury would have reached a different verdict without the error. The question of reversibility is viewed in light of the entire record and subject to unlimited review. The party asserting clear error has the burden to establish the error. *Betancourt*, 299 Kan. at 135.

Toole asserts the language in the jury instruction which defines lewd touching does not accurately state Kansas law based on the Supreme Court's decision in *State v. Dinh Loc Ta*, 296 Kan. 230, 290 P.3d 652 (2012). The challenged jury instruction states:

> "'Lewd fondling or touching' means fondling or touching in a manner which tends to undermine the morals of the victim, which is so clearly offensive as to outrage the moral senses of a reasonable person, and which is done with the specific intent to arouse or satisfy the sexual desires of either the victim or the offender or both. Lewd fondling or touching does not require contact with the sex organ of one or the other."

Toole claims the language "and which is done with the specific intent to arouse or satisfy the sexual desires of either the victim or the offender or both," is an inaccurate statement of law based upon *Dinh Loc Ta.*

First, it is helpful to identify the source of the language the district court utilized in the jury instruction. The language is a quote from PIK Crim. 3rd. 53.00 (2007 Supp.)—although as discussed later, the PIK language has recently been changed. Going one step further, the PIK instruction is based on the Supreme Court's holding in *State v. Wells*, 223 Kan. 94, 98, 573 P.2d 580 (1977).

In *Dinh Loc Ta*, the Supreme Court disapproved of the use of the defendant's mental state to define lewd fondling or touching, which was included in the *Wells* definition of lewd fondling or touching. The court found that the *Wells* court conflated two elements of the crime of indecent liberties—the touching must be lewd and the

5

touching must be done with specific intent to arouse. Utilizing the defendant's mental state to define a touching as lewd could lead to touching that is objectively not lewd being criminalized. Instead, the nature of the act itself must be used to determine whether a touching is lewd. *Dinh Loc Ta*, 296 Kan. at 240-43.

In reaching the decision in *Dinh Loc Ta*, the court strictly defined lewd fondling or touching.

> "In summary, a defendant's mental state should not be used to define or determine whether a touching is lewd. We, therefore, clarify *Wells* and hold that whether a touching is lewd should be determined by considering the common meaning of the term 'lewd,' that is whether a touching is 'sexually unchaste or licentious; suggestive of or tending to moral looseness; inciting to sensual desire or imagination; indecent, obscene, or salacious.' In considering if a touching meets this definition, a factfinder should consider whether the touching 'tends to undermine the morals of a child [and] . . . is so clearly offensive as to outrage the moral senses of a reasonable person.' Any contrary language in *Wells* is overruled." [Citations omitted.] 296 Kan. at 242-43.

In this context, the "contrary language" in *Wells* is the challenged language in this appeal—defining lewd touching as requiring specific intent of sexual arousal of the defendant. Based on *Dinh Loc Ta* it seems that the district court erred by including the specific intent language in the definition of lewd touching.

The Supreme Court, two years after the decision in *Dinh Loc Ta*, specifically approved of the language utilized in this jury instruction to define lewd touching. The court specifically stated that the language was "[c]onsistent with Kansas law." *State v. Reed*, 300 Kan. 494, 499-500, 332 P.3d 172 (2014). While *Reed* was not a challenge to the jury instruction itself, the court approved a definition including the specific intent language.

6

A panel of this court was faced with a similar challenge in *State v. Rios-Baltazar*, No. 110,921, 2015 WL 4879021 (Kan. App. 2015) (unpublished opinion). The panel determined, that because the Supreme Court in *Reed* held that the definition was consistent with Kanas law, there was no error in giving the instruction. The panel also relied upon the fact that the definition was a PIK instruction. 2015 WL 4879021, at *8. The holding in *Reed* and *Rios-Baltazar* are persuasive and we find no clear error in including the language regarding specific intent.

It should be noted the danger the court identified in *Dinh Loc Ta* was the conflation of two elements of indecent liberties—lewd touching and specific intent. The inclusion of the specific intent language in the definition of lewd touching could allow the jury to rely solely on the defendant's specific intent to determine whether the touching was lewd, and not the nature of the act itself. 296 Kan. at 242-43. Here, the State did not present any evidence of Toole's specific intent but rather relied upon the jury to infer that intent from the facts. Although we find no clear error including the specific intent language in the definition of lewd conduct, this case does not present the threat identified in *Dinh Loc Ta*.

Furthermore, the touching that constituted the charge of aggravated indecent liberties is clearly lewd under the definition from *Dinh Loc Ta*. Under *Dinh Loc Ta*, a touching is lewd if it undermines the morals of a child and clearly offends the morals of a reasonable person. 296 Kan. at 243. A.B. stated that for the first alleged inappropriate touching, Toole removed her pants and began rubbing her vaginal area with his hand. Rubbing the vagina of a seven-year-old clearly undermines the morals of the child and is clearly offensive as to outrage the moral sense of a reasonable person. See, e.g., *State v. Peltier*, 249 Kan. 415, 427, 819 P.2d 628 (1991); *State v. Krahl*, No. 115,024, 2017 WL 3203331, at *8 (Kan. App. 2017) (unpublished opinion). Had the jury been provided the definition of lewd conduct without the specific intent language, it is unlikely that the jury verdict would have changed because the nature of Toole's conduct was objectively lewd.

7

Even if we had found the language concerning specific intent in the jury instruction for aggravated indecent liberties with a child was erroneous, it had little to no impact on the jury's verdict due to no evidence being presented on Toole's specific intent and Toole's conduct being unequivocally lewd. Therefore any error would have been harmless.

*Did the district court err by not giving a unanimity instruction for the charge of aggravated indecent liberties with a child?*

Toole asserts the district court erred by failing to give a unanimity instruction for the aggravated indecent liberties with a child charge. Toole did not request a unanimity instruction for this charge; rather, he explicitly stated that one was not necessary due to the partial granting of the judgment of acquittal. Similar to Toole's argument on the language within the definition of lewd conduct, Toole's claim of error is reviewed for clear error. The clearly erroneous standard of review is appropriate even though Toole raises the issue under a claim of constitutional error. See *Williams*, 295 Kan. at 517.

The first step in reviewing for clear error is to determine whether the failure to give the unrequested instruction was erroneous. In other words, the court must determine whether it was legally and factually appropriate to give a unanimity instruction. See *Plummer*, 295 Kan. at 168. The Kansas Supreme Court has established a three-step analytical framework for determining whether a unanimity instruction is proper. First, the court must determine if it is a case involving multiple acts that could constitute the offense. Second, the court must determine if there is error—meaning whether there was a failure to elect an act that constitutes the offense or instruct the jury on the requirement of unanimity. Third, if the reviewing court determines error occurred, it must determine whether the error is reversible. *State v. Voyles*, 284 Kan. 239, 252-53, 160 P.3d 794 (2007).

Toole alleges this case involves multiple acts because A.B. testified to five distinct events that could have been the basis for the crime of aggravated indecent liberties with a child. A case involves multiple acts when the State charges a single count based upon several, multiple acts and any one of those acts could constitute the crime charged. *State v. Davis*, 275 Kan. 107, 115, 61 P.3d 701 (2003). Acts can be multiple acts if they are factually separate and distinct. *State v. Kesselring*, 279 Kan. 671, 683, 112 P.3d 175 (2005). There is no precise formula for determining whether multiple acts are presented by a case; rather, the courts review the facts and theory of the crime as it was argued to determine whether the jury verdict implicates unanimity issues. *State v. Allen*, 290 Kan. 540, Syl. ¶¶ 1, 2, 232 P.3d 861 (2010).

The Kansas Supreme Court has recognized that there are other factors which are relevant to the determination whether there are multiple acts, which may support a unanimity instruction. The court should consider: "(1) whether the acts occur at or near the same time; (2) whether the acts occur at the same location; (3) whether there is a causal relationship between the acts, in particular whether there was an intervening event; and (4) whether there is a fresh impulse motivating some of the conduct." *State v. Schoonover*, 281 Kan. 453, 507, 133 P.3d 48 (2008).

*State v. Colston*, 290 Kan. 952, 235 P.3d 1234 (2010), *overruled on other grounds by State v. Dunn*, 304 Kan. 773, Syl. ¶ 4, 375 P.3d 332 (2016), presents a similar factual scenario. In *Colston*, the defendant challenged the lack of unanimity instruction for aggravated indecent liberties because multiple events could have made up the charge when the evidence supported that there was (1) sexual intercourse through penetration; (2) oral sex; (3) the defendant placing the victim between his legs while at a pool; (4) removing the victim's clothes prior to intercourse; and (5) the defendant fondling the victim's breasts. 290 Kan. at 965.

9

The court found that the evidence of sexual intercourse and oral sex did not make the case one involving multiple acts because the multiple acts rule applies when the State presents evidence of two or more acts that could support a single count. Based upon the arguments of the State, the court concluded that the jury could not have based the aggravated indecent liberties charge on the acts of sexual intercourse or oral sex. Furthermore, the court found that the act of removing the victim's clothes was a unitary act with the subsequent acts based upon the *Schoonver* factors. Only one act, the fondling of the victim's breasts, supported the charge of indecent liberties. Thus, the case did not involve multiple acts and no unanimity jury instruction was required. 290 Kan. 966-68.

Here, four of the five acts that Toole claims support that this is a case involving multiple acts are acts from the events that are the basis for the charges of rape. Based upon the holding in *Colston*, the actions that support the charges of rape do not support that this is a case involving multiple acts. Toole allegedly taking off A.B.'s clothes and rubbing her vagina prior to inserting either his finger or penis is a unitary act with the penetration that subsequently occurred, and those acts were the basis for the charges of rape. See 290 Kan. 966-68; *Schoonver*, 281 Kan. at 507. Only one event that Toole identifies, the event where no penetration occurred, would support the aggravated indecent liberties charge.

This is especially true in light of the State's theory of the case. In determining whether multiple acts exists, the court should rely on the facts of the case and the theory of the case. *Allen*, 290 Kan. 540, Syl. ¶¶ 1, 2. The State only claimed that the first incident, where Toole rubbed A.B.'s vagina but did not penetrate her, was the basis for the indecent liberties charge; whereas the events where Toole both rubbed A.B.'s vagina and penetrated her were rape. Based upon the State's theory of the case, there were not multiple acts that could constitute the crime of aggravated indecent liberties with a child.

10

The State did not present multiple acts that could have constituted a single count. Rather, there were multiple acts that constituted multiple counts of different charges. Any action that could potentially have supported a charge of aggravated indecent liberties was a unitary act with one of the rape charges. Because there are not multiple acts that would support a single charge, there is no error by not giving a unanimity jury instruction.

Even if this case involves multiple acts, there is no error in failing to provide a unanimity instruction because the State clearly elected which act constituted the aggravated indecent liberties with a child and which acts constituted rape. There is no error in failing to give a unanimity instruction in a multiple acts case when the State elects the facts that support the crime in its closing arguments to the jury. See *State v. Moyer*, 302 Kan. 892, 911-12, 360 P.3d 384 (2015). Here, the State made a proper election of the facts the jury was to rely upon for the aggravated indecent liberties charge:

> "The defendant lived with the victim and her family in Fort Scott, Kansas, which was in Bourbon County, during the fall semester of school.
> "[A.B.] maybe 15 now, but she was seven when these crimes occurred. She was able to tell you about six different times that something happened to her during that period.
> "First thing she told you about was that the defendant coming into her bedroom at nighttime, rubbing her vagina with his hand. That first incident that she spoke of is your aggravated indecent liberties with a child."

The State went on to discuss each of the remaining five events and how the facts of those events supported a charge of rape. By stating that Toole's actions during the first incident were the factual basis for the aggravated indecent liberties charge and the subsequent incidents were the basis for the rape charges, the State was focusing the jury's attention on the acts that it was relying upon for the aggravated indecent liberties charge. See *Moyer*, 302 Kan. at 912. Thus, the State made a proper election of facts, and there is no error by failing to give a unanimity jury instruction for this charge.

11

Because there is no error in the failure to give a unanimity jury instruction because either this is not a multiple acts case or the State properly elected a factual basis, there is no need to discuss the merits of Toole's prejudice argument. Without going into the merits, Toole's argument should be briefly addressed. Toole argues this court should not apply the federal constitutional error test. Toole's argument fails for two points due to established caselaw.

First, presenting a procedural posture that there is a constitutional error does not allow Toole to escape the clearly erroneous standard of review. Claims that were not presented at the lower court, even claims of constitutional error, generally may not be raised for the first time on appeal. The Kansas Supreme Court has applied this general rule to unraised claims of jury instruction errors and has found the clearly erroneous standard is the correct standard to apply. *Williams*, 295 Kan. at 517. Thus, because Toole did not raise this jury instruction issue before the district court, this court must apply the clearly erroneous standard of review, which would analyze the prejudice if error is presented by the case. *Betancourt*, 299 Kan. at 135.

Second, and more specifically, the Kansas Supreme Court has held "the right to a unanimous jury verdict in a Kansas court is not a federal constitutional right or a state constitutional right, but rather a state statutory one. [Citations omitted.]" *Voyles*, 284 Kan. at 250. The *Voyles* court cited sections 5 and 10 of the Kansas Constitution Bill of Rights in making the determination that the right to a jury trial is a statutory right. 284 Kan. at 250-51. Further, the *Voyles* court specifically rejected using the federal constitutional error test when analyzing a claim that a unanimity jury instruction was required if the issue was not raised below. Rather, the clearly erroneous analysis should be used to analyze the claim. 284 Kan. at 252-53. Because this court is duty bound to follow Kansas Supreme Court precedent, we would analyze the prejudicial effect of any error under the clearly erroneous standard as set out in *Voyles*. See *State v. Ottinger*, 46 Kan. App. 2d 647, 655, 264 P.3d 1027 (2011).

12

*Did the district court erroneously find that the pictures of the text messages were authenticated for purposes of admissibility?*

Toole challenges the district court's decision to admit photographs of the text message conversation between Tamai and O'Neal. At the district court, Toole objected to their admission for lack of authentication and as hearsay within hearsay. On appeal, Toole's challenge to the authentication has been preserved by the contemporaneous objection.

Toole and the State agree that the text messages should be analyzed as a writing that requires authentication under K.S.A. 60-464. Under the definition of writing found in K.S.A. 60-401(m), a text message is clearly a writing because a writing "means handwriting, typewriting, printing, photostating, photographing and *every other means of recording upon any tangible thing any form or communication or representation*, including letters, words, pictures, sounds, or symbols, or combinations thereof." (Emphasis added.) Under K.S.A. 60-464, before a writing may be introduced into evidence there must be proof of its authenticity.

For a writing to be authenticated, the proponent of the evidence must proffer some evidence so that a reasonable juror could find that the writing is what the proponent of the evidence claims it is. The burden on the proponent has been characterized as minimal or slight. *State v. Robinson*, 303 Kan. 11, 225-26, 363 P.3d 875 (2015), *disapproved on other grounds by State v. Cheever*, 306 Kan. 706, 402 P.3d 1126 (2017). The determination of whether the burden of authentication has been met is left largely to the discretion of the district court. *State v. Hill*, 290 Kan. 339, 364, 228 P.3d 1027 (2010). Under this abuse of discretion standard, the appellate courts do not disturb the district court's determination unless no reasonable person would have taken the same view. See *State v. Ernesti*, 291 Kan. 54, 64-65, 239 P.3d 40 (2010).

There is no precise formula for a district court to use to determine whether certain evidence has been properly authenticated; rather, it falls to whether the district court is satisfied with the proof offered. *Robinson*, 303 Kan. at 225. The proof of a document's authenticity may be from indirect or circumstantial evidence. *Hill*, 290 Kan. at 365. The Kansas Supreme Court has held that this "[c]ircumstantial evidence may include 'appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances.' [Citations omitted.]" *Robinson*, 303 Kan. at 225 (quoting Fed. R. Evid. 901[b][4]). Once the document has been sufficiently authenticated, discrepancies and other conflicts with the evidence goes to the weight, and not admissibility, of the writing. 303 Kan. at 226.

A panel of this court faced a similar challenge to the authentication of text messages in *State v. Winder*, No. 98,036, 2008 WL 3367575, at *3-4 (Kan. App. 2008) (unpublished opinion). In *Winder*, evidence was presented that a person received text messages from the defendant. The person that received the messages had saved the phone number of the defendant in the phone under a nickname, and the messages came from that phone number. Additionally, the owner of the phone had received a phone call from the defendant about two weeks prior to receiving the messages. Further, the content of the messages circumstantially provided authenticity because it referenced previous conversations between the owner of the phone and the defendant. Based on these facts, the panel determined the district court did not err by admitting the text messages. Additionally the panel stated, "any doubt as to whether [the defendant] sent the text messages goes to the weight rather than the admissibility of the evidence." 2008 WL 3367575, at *4.

Additionally, in *Robinson*, the Kansas Supreme Court addressed the authenticity of e-mail messages that were introduced into evidence. 303 Kan. at 226-30. An e-mail and a text message are sufficiently similar that the court's analysis is very pertinent. In discussing authentication, the court stated:

14

"Based on her independent recollection, Remington testified that State's Exhibits 4 and 5 were printouts from her home computer of e-mails she received from and sent to Robinson when he was posing as Trouten. She confirmed the content of the messages were true and accurate and that she did not alter them in any way. Based on this testimony, the State adequately authenticated State's Exhibits 4 and 5." 303 Kan. at 226.

The court also discussed how the circumstantial evidence supported authentication. The messages showed an entire conversation, and the messages were logically connected, reflecting an ongoing dialogue between the parties. 303 Kan. at 227.

Here, Tamai testified that she received the messages on her phone. The messages came from a contact in the phone named Teresa O'Neal. Tamai testified that this contact was her sister. Further, Tamai testified that each message was a true and accurate representation of the messages she sent and received in the text message conversation. Under *Robinson,* this testimony by Tamai is sufficient to establish the authenticity of the messages. In other words, Tamai's testimony that these messages came from her sister is sufficient for a reasonable juror to believe the text messages were messages from her sister.

Going one step further, circumstantial evidence from the content of the messages themselves provides circumstantial evidence of the text messages' authenticity. See *Hill*, 290 Kan. at 365. Towards the end of the chain of text messages, Tamai remarks how the stress from the events has caused a lack of sleep and weight loss. O'Neal responded concerning how the stress was affecting her. This is a type of conversation that would be typical of family members discussing these events; thus, it is reasonable to infer from the content of the messages that the messages were in fact from O'Neal.

Toole argues that the State failed to authenticate the text messages because there was no evidence that O'Neal was the person that actually sent the messages. In support of this position, Toole relied upon caselaw from the Missouri Court of Appeals. In

analyzing the authenticity of a writing, the Missouri courts require some proof that the writing was written by the declarant. See, e.g., *State v. Harris*, 358 S.W.3d 172, 175-76 (Mo. Ct. App. 2011). Toole's argument is not persuasive because Kansas does not adhere to this principle. Rather, Kansas courts view inconsistencies in the writing, conflicts with other evidence, and whether the proponent of the evidence is correct in their belief regarding authorship of the writing, as questions that influence the weight of the evidence and not the authenticity. See *Robinson*, 303 Kan. at 226; *Winder*, 2008 WL 3367575, at *4.

Based upon Tamai's testimony concerning the messages and the circumstantial evidence from the content of the messages, the State satisfied the minimal burden of authentication. The district court did not abuse its discretion in admitting the text messages into evidence.

*Did cumulative error require reversal?*

Toole's final argument is that cumulative error requires reversal. Having found no error, the cumulative error doctrine is inapplicable.

Affirmed.

16