IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 114,417

STATE OF KANSAS,
*Appellee*,

v.

DANG SEAN,
*Appellant.*

SYLLABUS BY THE COURT

1.

When a pretrial motion to suppress has been denied, K.S.A. 60-404 requires that the moving party still object to the introduction of the evidence at trial in order to preserve the issue for appeal. This is known as the contemporaneous-objection rule. Specifically, the statute requires a timely, on-the-record objection to the admission of the evidence that clearly states the specific ground of objection.

2.

In this case, we decline to use exceptions to the contemporaneous-objection rule to bypass the clear statutory guidelines provided in K.S.A. 60-404.

3.

When analyzing a claim of prosecutorial error, an appellate court employs a two-step process. First, the appellate court determines whether error occurred. If there was error, the second step is to determine whether prejudice resulted. Under the first step, the appellate court analyzes whether the prosecutor's acts fell outside the wide latitude afforded prosecutors. At the second stage of the analysis, the appellate court focuses on whether the error prejudiced the defendant's due process rights to a fair trial. If a due

1

process violation occurred, the appellate court assesses prejudice by applying the constitutional harmless error standard.

4.

Under the constitutional harmless error standard, prosecutorial error is harmless if the State proves beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict.

5.

Generally appellate courts do not require a contemporaneous objection to preserve issues of prosecutorial error for appellate review. However, in accordance with the plain language of K.S.A. 60-404, evidentiary claims—including questions posed by a prosecutor and responses to those questions during trial—must be preserved by way of a contemporaneous objection for those claims to be reviewed on appeal. But appellate courts will review a prosecutor's comments made during voir dire, opening statement, or closing argument on the basis of prosecutorial error even without a timely objection, although the presence or absence of an objection may figure into the analysis of the alleged error.

6.

The Fourteenth Amendment affords a criminal defendant the right to employ counsel as an extension of his or her right to a fair trial. Accordingly, it is improper for the prosecutor, by questions or comments, to draw incriminating inferences from a defendant's exercise of this right.

7.

When the State asks a witness questions regarding the defendant's retention of an attorney, those questions contravene the protections explicitly enumerated in *State v. Dixon*, 279 Kan. 563, 112 P.3d 883 (2010).

8.

In general, prosecutors may not offer juries their personal opinions as to the credibility of witnesses. Prosecutors have wide latitude, however, to craft arguments that include reasonable inferences to be drawn from the evidence. That latitude includes explaining to juries what they should look for in assessing witness credibility, especially when the defense has attacked the credibility of the State's witnesses.

9.

A prosecutor acts outside of that wide latitude afforded when the prosecutor refers to the defendant as a "liar" and states in closing argument that the truth shows beyond a reasonable doubt the defendant is guilty.

10.

A prosecutor does not act outside of the wide latitude afforded if he or she merely observes that some reasonable inference about witness credibility may be drawn from evidence introduced at trial.

11.

Arguments not briefed on appeal are deemed waived and abandoned.

12.

Unlike a failure to object to evidence, a failure to object to an instruction does not bar appellate review of the instruction. It does, however, raise the persuasive bar the

3

complaining party must hurdle on appeal; the appellate court must be convinced the instruction is clearly erroneous.

13.

When a party's appellate arguments regarding a limiting instruction are actually veiled attempts to reach unpreserved evidentiary issues, courts do not consider the arguments.

14.

Appellate courts review a trial court's determination that hearsay is admissible under a statutory exception for an abuse of discretion. Judicial action constitutes an abuse of discretion if it is arbitrary, fanciful, or unreasonable, *i.e.*, if no reasonable person would have taken the view adopted by the trial court; is based on an error of law, *i.e.*, if the discretion is guided by an erroneous legal conclusion; or is based on an error of fact, *i.e.*, if substantial competent evidence does not support a factual finding on which a prerequisite conclusion of law or the exercise of discretion is based.

15.

K.S.A. 2016 Supp. 60-460 bars admission of evidence of a statement that is made other than by a witness while testifying at the hearing, offered to prove the truth of the matter stated, unless it falls into one of the exceptions outlined in the statute. One of these exceptions is the declarations against interest exception, which provides that a statement which the judge finds was at the time of the assertion so far contrary to the declarant's pecuniary or proprietary interest or so far subjected the declarant to civil or criminal liability or so far rendered invalid a claim by the declarant against another or created such risk of making the declarant an object of hatred, ridicule, or social disapproval in the community that a reasonable person in the declarant's position would not have made the statement unless the person believed it to be true.

4

16.

When statements are not offered to prove the truth of the matter stated, they are not hearsay.

17.

When determining whether an alleged violation of statutory evidentiary limitations was error, an appellate court applies the standards set out in K.S.A. 2016 Supp. 60-261 and K.S.A. 60-2105. These standards provide that the court will consider whether a reasonable probability exists that the error affected the outcome of the trial in light of the record as a whole. The burden of persuasion lies with the party benefitting from the introduction of the evidence.

18.

Under K.S.A. 22-3423(1)(c), a trial court may declare a mistrial if there was prejudicial conduct either inside or outside the courtroom that makes it impossible for the trial to proceed without injustice to either the defendant or the prosecution.

19.

K.S.A. 22-3423(1)(c) creates a two-step process. First, the trial court must determine if there was some fundamental failure of the proceeding. If so, the trial court moves to the second step and assesses whether it is possible to continue without an injustice. In other words, the trial court must decide if the prejudicial conduct's damaging effect can be removed or mitigated by an admonition, jury instruction, or other action. If not, the trial court must determine whether the degree of prejudice results in an injustice and, if so, declare a mistrial.

20.

An appellate court reviews a trial court's decision regarding a motion for mistrial in two parts: (1) Did the trial court abuse its discretion when deciding if there was a fundamental failure in the proceeding? and (2) Did the trial court abuse its discretion when deciding whether the conduct resulted in prejudice that could not be cured or mitigated through jury admonition or instruction, resulting in an injustice?

21.

When a party argues that the cumulative impact of alleged errors is so great that they result in an unfair trial, an appellate court aggregates all the errors and, even if those errors individually would be considered harmless, analyzes whether their cumulative effect is so great that they collectively cannot be determined to be harmless. In undertaking such an analysis, an appellate court reviews the entire record and exercises unlimited review. One error is insufficient to support reversal under the cumulative error doctrine.

Appeal from Sedgwick District Court; BENJAMIN L. BURGESS, judge. Opinion filed August 4, 2017. Affirmed.

*Richard Ney*, of Ney & Adams, of Wichita, argued the cause and was on the briefs for appellant.

*Lance J. Gillett*, assistant district attorney, argued the cause, and *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

MALONE, J.: Dang Sean appeals his convictions of first-degree premeditated murder and kidnapping. This is a companion case to *State v. Jones*, No. 113,409, an appeal from convictions arising out of the same series of events presented in this case.

Sean raises eight issues in his appeal, alleging (1) a denial of his Fifth Amendment right to counsel; (2) multiple claims of prosecutorial error; (3) error in the admission of bad acts evidence; (4) error in the admission of certain hearsay statements; (5) error in the denial of his motion for mistrial; (6) a violation of his Confrontation Clause rights; (7) error in the admission of sympathy evidence; and (8) cumulative error compelling reversal. We reject Sean's claims and affirm his convictions and sentence.

FACTS AND PROCEDURAL BACKGROUND

On January 16, 2013, Shawn Lindsey's body was discovered by a passerby off a road near the Humane Society in Wichita, Kansas. The body had ligature marks on the wrist, and there was evidence someone had dragged the body to the spot. The forensic pathologist who performed an autopsy testified that the cause of death was methamphetamine toxicity and the manner of death was homicide.

Sean was charged with first-degree premeditated murder, felony murder, and aggravated kidnapping of Lindsey. Justin Jones (Justin) and Jason Jones (Jason) were also charged in connection with Lindsey's murder, and Phomphikak Phouthalaksa (Air), Aaron Stricker, and Anthony Garza were charged in connection with his kidnapping. The defendants were tried separately.

The State's case against Sean was based largely on the eyewitness testimony of Garza, an acquaintance of both Sean and Lindsey. The State secured Garza's testimony by agreeing to amend his charges down from murder and aggravated kidnapping to a single count of kidnapping. Will Coleman, an employee of Sean, corroborated much of Garza's testimony. Through these witnesses and others, the State presented evidence to establish the following facts.

7

Sean and Lindsey opened an auto shop together in 2012 but cut business ties by the end of the year. In January 2013, Lindsey was in debt to Sean for using the company credit card and account without permission and for stealing parts from the shop. The State introduced evidence that the debt had been accruing for some time, and that by the end of 2012, Sean had grown impatient with Lindsey, demanding repayment and threatening via text message to "repo" and "crack sum fuckn heads" if Lindsey did not comply. In November 2012, Sean texted Lindsey and demanded Lindsey turn over his truck and come to the shop. He also texted Lindsey to "get zip tie ready."

On Friday, January 11, 2013, Garza called Sean to tell him he was coming to the shop. Sean asked Garza to pick up Lindsey on his way there. Garza went to Lindsey's house around 4:30 p.m., accompanied by his girlfriend's 17-year-old nephew Reuben Carrion, Jr., and his friend, Stricker. The men arrived at Lindsey's house right as Lindsey and his girlfriend, Chelsea Bernhard, were returning from an errand. The men talked inside the house while Bernhard took a phone call in the other room. When Bernhard finished her phone call, Lindsey and Garza said they were going to the shop and that she should come by, too. The men left for the shop and Bernhard followed later.

Carrion dropped Garza, Lindsey, and Stricker off at the shop and left. Sean and his employees, Air, Justin, Jason, and Coleman, were inside. Lindsey and Sean talked about Lindsey's debt until the conversation became heated. Sean began beating Lindsey, knocking him to the ground. Sean then demanded that Lindsey get his truck. At 6:18 p.m., Coleman texted Lindsey's ex-girlfriend that Lindsey had just been "beat down."

After the beating, Lindsey, Stricker, and Jason left to look for Lindsey's truck. The State posited that Sean wanted the truck as satisfaction or collateral for the debt. While they were looking for the truck, Garza received a phone call from Justin's phone and was

8

told that Sean had gone home for awhile but wanted Lindsey zip-tied by the time he got back to the shop. The men did not find Lindsey's truck and returned to the shop.

Bernhard arrived at the shop but could not get inside. Lindsey met her at the door and told her through the glass that he could not leave and that she should go get his friend Neeley. Bernhard left to find Neeley.

Sean, carrying a duffel bag, returned to the shop. Shortly thereafter, Sean instructed Garza to zip-tie Lindsey. Garza zip-tied Lindsey's arms to a chair behind his back and zip-tied his feet. At this point, Coleman left the shop after asking Sean for permission to do so.

Sometime after Coleman left, Sean handed Jason a bag of methamphetamine and Justin looked for a heat source. Sean slapped Lindsey's arm and injected him with a large syringe full of the methamphetamine while Justin held the arm in place. Sean asked Lindsey if it burned, and Lindsey replied, "Yeah, it does burn. Please stop, please stop, please stop. You don't have to do this, I'm going to pay you."

Once Sean finished injecting Lindsey, Air brought in an electric fence, which Jason and Justin wrapped around Lindsey and then hooked up to a car battery starter. Sean pulled an airsoft pellet gun and a firearm from his bag and began shooting Lindsey's shins with the airsoft gun. Sean then loaded the firearm and pointed it at Lindsey, taunting him. Sean also shot at the battery starter with the airsoft gun in an effort to turn on the electric fence. During this time, Lindsey started shaking and bouncing his feet up and down, which Garza took to be a sign that the methamphetamine was affecting him.

After Sean failed to turn the battery charger on with the airsoft gun pellets, someone removed the electric fence from around Lindsey. Lindsey was shaking violently

9

by that point and going stiff, and Garza heard someone say that "he's about to go." Lindsey asked Garza to cut the zip ties because they were hurting him. Sean told Garza to leave the wrist ties but to cut the ties from Lindsey's ankles so they could take him to the hospital. Jason and Sean then loaded Lindsey into a black Chevy Silverado. Garza left the shop shortly thereafter at Sean's direction.

A security camera in the Humane Society parking lot showed the driveway to the area where Lindsey's body was discovered days later. Just after 10:47 p.m., the camera recorded headlights in the area. A dark-colored vehicle with a bed left shortly thereafter. The State posited that this was the same black Silverado that left the auto shop with Jason, Sean, and Lindsey and that it was traveling in that area to dump Lindsey's body.

Noal Reynolds, an employee of the Pleasures nightclub, testified for the defense. He stated that Sean and Air were at Pleasures on January 11, 2013, from 11:30 p.m. until about 2 a.m. Pleasures is located at 4849 South West Street in Wichita, Kansas.

Around 1:30 a.m. on January 12, 2013, Jason texted Garza not to say anything to his girlfriend. Jason then called Garza to say they were coming to pick him up. Coleman returned to the shop around 2 a.m. Soon thereafter Jason and Justin showed up with Garza and were met by Sean and Coleman. The five men smoked methamphetamine together, and Sean pressed Garza for Stricker's "information." Sean told Garza that if Garza or Stricker "said anything" they were dead.

Bernhard spent the next few days trying to track down Lindsey. She texted Sean to ask about Lindsey. Sean replied that "he might be working it off in Mexico" and that "it [was] out of [his] hands." On January 13, 2013, Bernhard and Lindsey's father reported Lindsey missing.

10

Lindsey's body was recovered on January 16, 2013, near the area where the security camera recorded headlights and a dark-colored vehicle with a bed on the night of January 11. Detectives interviewed Sean later that evening. Sean told detectives that on January 11, 2013, Lindsey arrived at his shop around 6 p.m. with two "Mexicans" named Paloen and Fernando. Sean claimed that the two "Mexicans" looked around for Lindsey's truck. According to Sean, the three men left after about 15 minutes, and he went to his sister's house around 6:15 or 6:20. Sean said that he also went to Pleasures nightclub that night.

Search warrants were executed at the shop on January 16, January 18, and January 20. From these searches, the police recovered methamphetamine and paraphernalia, a duffel bag, two airsoft pistols, two airsoft BBs, a bag of additional BBs, a needleless syringe, zip ties, and an electric fence.

During trial, defense counsel focused heavily on the fact that Garza's initial statement to the police was different from his second and third interviews conducted after reaching an agreement with the State. In that first statement, Garza claimed to have much less involvement than he later admitted. Defense counsel's theory of the case appeared to be that Garza was one of the "Mexicans" who arrived at the shop with Lindsey, that Garza killed Lindsey because of a debt Lindsey owed Garza, and that Garza was pinning the murder on Sean in exchange for a lighter sentence.

A jury convicted Sean of premeditated first-degree murder and kidnapping but acquitted Sean of felony murder. The jury did not unanimously agree on a hard 50 sentence; so the district court imposed a hard 25 sentence for the murder conviction and a consecutive 77-month sentence for the kidnapping conviction.

Sean timely appealed. This court has jurisdiction under K.S.A. 2016 Supp. 22-3601(b)(3) and (4) (off-grid crime; maximum sentence of life imprisonment imposed).

ANALYSIS

Sean presents a number of issues. We address each in turn.

*Suppression of Interrogation Statements*

Sean first argues the trial court should have suppressed statements he made during a police interrogation because they were given in violation of his Fifth Amendment right to counsel. We do not reach the merits of this argument because we conclude that Sean failed to preserve this issue for appeal.

When a pretrial motion to suppress has been denied, K.S.A. 60-404 requires that the moving party still object to the introduction of the evidence at trial in order to preserve the issue for appeal. *State v. Houston*, 289 Kan. 252, 270, 213 P.3d 728 (2009). This is known as "the contemporaneous-objection rule and is codified in K.S.A. 60-404. [Citation omitted.] Specifically, the statute requires an on-the-record 'objection to the evidence timely interposed and so stated as to make clear the specific ground of objection.'" 289 Kan. at 270.

In *State v. Dukes*, 290 Kan. 485, 488, 231 P.3d 558 (2010), we noted our recent and consistent refusal to review evidentiary issues that were not preserved even when those issues involved fundamental rights. In that discussion, we expressed our concern that, otherwise, "[t]he contemporaneous objection rule 'case-law exceptions would soon swallow the general statutory rule.'" 290 Kan. at 488 (citing *State v. Richmond*, 289 Kan. 419, 429-30, 212 P.3d 585 [2009]).

12

Here, in a pretrial motion, defense counsel argued that the trial court should suppress all statements Sean made during a police interrogation because the statements were involuntary and were not made pursuant to a knowing and intentional waiver of rights. After an evidentiary hearing, the trial court denied the motion, finding that Sean had voluntarily reinitiated contact with the police after requesting an attorney and thereby waived his right to counsel.

At trial, Sean's statements were introduced via the testimony of investigating Detective Timothy Relph. Defense counsel did not object to Relph's testimony.

However, Sean argues that this issue was preserved for appeal because an objection made earlier in the trial served to give the trial court notice that defense counsel meant to renew his challenge to the admission of Sean's statements. However, the record makes it clear that this was a *State v. Elnicki*, 279 Kan. 47, 105 P.3d 1222 (2005), objection to the State's desire to play a videotape of the interrogation, not an objection to the admission of the statements made during the interrogation. During a break in the trial, the prosecutor informed the judge and defense counsel that the State intended to play a redacted video of Sean's interrogation for the jury. In response, defense counsel said:

> "I object to the transcript ever being shown to the jury. I object to this tape being called or played, where they pull out what they want to pull out, put in what's clearly inadmissible under *Elnicki*, and expect me over the lunch hour to review all of their exhibits to make sure they are admissible or not. I have better things to prepare for than exhibits being dumped on me in the middle of the trial."

The prosecutor responded that it would "just put Detective Relph on" and would not "even bother with the video." The judge replied "if the proposal now is to just call Detective Relph, have him testify as to the interview, that's fine. The tape-recorded

13

conversation will not be allowed at this point. Anything further we need to take up before we bring the jury in?" To this, defense counsel replied, "No, Your Honor." Later that afternoon, the prosecutor called Relph who testified about Sean's statements during the interrogation. Defense counsel did not object to this testimony.

Defense counsel's statements at trial were clearly in reference to the admission of the videotape without his having had an opportunity to review the tape for *Elnicki* violations. That the objection was in reference to *Elnicki* and nothing else was underscored by defense counsel's failure to object to the State's offer to instead introduce Sean's statement's via Detective Relph's testimony. Because Sean did not renew his objection to the admission of these statements during trial, he did not preserve this issue for our review.

We find it concerning that appellate defense counsel argued so strongly that the objection at trial amounted to a specific objection to the admission of Detective Relph's testimony. Whether this argument evolved from a misunderstanding of the record or an unclear assessment of the law, we do not know. In case appellate counsel's arguments stem from some obscurity surrounding the contemporaneous objection rule, we take this opportunity to reiterate an important principle. When a party moves to suppress evidence and the court denies the motion, the party must timely and specifically renew this objection when the opposing party moves to admit the evidence during trial. Failure to do so results in a failure to preserve the issue for appeal.

Sean contends that, even if this issue was not preserved for appeal, review is necessary to serve the ends of justice and prevent denial of a fundamental right. See *State v. Barnes*, 293 Kan. 240, 255, 262 P.3d 297 (2011) (explaining that exceptions may be granted if the argument presents a question of law arising from proved or admitted facts that is determinative of the case; consideration of the issue is necessary to serve the ends

14

of justice or prevent the denial of fundamental rights; or the trial court is correct for the wrong reason). We decline to use this exception to bypass the clear statutory guidelines provided in K.S.A. 60-404.

*Prosecutorial Error*

Sean argues that the prosecutor committed error in four different ways:  (1) by repeatedly introducing drug evidence in violation of an order in limine; (2) by asking questions regarding Sean's retention of an attorney; (3) by violating a court order when it procured certain testimony regarding an alibi; and (4) by commenting on the credibility of a witness. We address each argument separately.

When analyzing a claim of prosecutorial error, we employ a two-step process. First, we determine whether error occurred. If there was error, the second step is to determine whether prejudice resulted. Under the first step, we analyze whether the prosecutor's acts fell outside the wide latitude afforded prosecutors. At the second stage of the analysis, we focus on whether the error prejudiced the defendant's due process rights to a fair trial. If a due process violation occurred, we assess prejudice by applying the *Chapman* constitutional error standard. *Chapman v. California*, 386 U.S. 18, 24, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967). Under *Chapman*, "'prosecutorial error is harmless if the State proves beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict.'" *State v. Kleypas*, 305 Kan. 224, 316, 382 P.3d 373 (2016).

Generally we do not require a contemporaneous objection to preserve issues of prosecutorial error for appellate review. *State v. King*, 288 Kan. 333, 344, 204 P.3d 585 (2009). However, "in accordance with the plain language of K.S.A. 60-404, evidentiary

15

claims—including questions posed by a prosecutor and responses to those questions during trial—must be preserved by way of a contemporaneous objection for those claims to be reviewed on appeal." 288 Kan. at 349. But we will review a prosecutor's comments made during voir dire, opening statement, or closing argument on the basis of prosecutorial error even without a timely objection, "although the presence or absence of an objection may figure into our analysis of the alleged misconduct." 288 Kan. at 349.

1. *Violation of the order in limine*

Sean argues the prosecutor violated the order in limine by introducing drug evidence on 14 different occasions, including once in the opening statement and once during closing arguments. After review of the record, it is clear that Sean only objected on one of those occasions and that the trial court sustained that objection.

Because Sean did not object to the 13 other alleged violations, the only instances of alleged error that we review are those that occurred during the opening statement and closing argument. While Sean argues that this court should review all instances in the interest of justice, we again decline to use this exception to bypass clear statutory guidelines.

We begin by assessing whether the State's actions fell outside of the wide latitude afforded prosecutors.

The State filed a pretrial motion to admit evidence that would establish the following three points:

> "1. Evidence that Shawn Lindsey was killed to settle a debt that may have been incurred through illegal drug transactions."

16

"2. Evidence that [Sean] (as well as co-defendants) possessed illegal drugs and drug paraphernalia."

"3. Evidence that on August 4, 2012, police searched and located a 2001 black Chevy Silverado truck belonging to Dang Sean on the premises of Automotive Bullies."

Sean had no objection to paragraph 2 of the motion and thus the court granted paragraph 2. The court granted paragraph 3 over Sean's objection. Sean also objected to paragraph 1, arguing that "there has to be some evidence to back it up [that the victim owed a drug debt to Lindsey] and they don't have any." In a subsequent pretrial hearing, the State entered a stipulation with regard to paragraph 1 that read "Sean Lindsey had a debt to Dang Sean," eliminating the reference to a *drug* debt. Sean accepted that stipulation, and the court entered an order acknowledging the stipulation.

Sean argues that prosecutorial error occurred because "[d]espite the parties' stipulation, and the district court's in limine order, the State repeatedly introduced drug evidence at trial in violation of the order."

Sean's argument is perplexing because the order in limine did not prohibit drug evidence. Indeed, it was an unopposed order that *allowed* such evidence.

Sean contests this point by directing this court to the State's comments regarding the stipulation. During a pretrial hearing, the prosecutor said, "I suggest that maybe we need to table this Paragraph 1, is that we craft a stipulation that meets both parties' goal and limits evidence of other crimes evidence."

17

This statement fails to offer support for Sean's argument because, even if it did function to limit the admissibility of "other crimes evidence," paragraph 2, to which Sean had no objection, specifically allowed drug evidence.

It may be that when Sean says the prosecutor offered drug evidence in violation of the order, he means that the prosecutor offered drug *debt* evidence in violation of the order. Even if we accept this as his argument, there was no error because the prosecution never introduced evidence of a drug debt.

During the opening statement, the prosecutor told the jury:

"You're going to hear from Will Coleman. Will is an interesting character. Will is going to tell you that this shop is a place where people went to use methamphetamine. He said they used it all the time. In fact, Will is even going to say that for a time period his primary wages at the shop was just basically the ability to smoke free methamphetamine."

During closing arguments, the prosecutor said the following:

"I want to pause for a moment, and in case anybody says, 'Well, why Garza? I mean, why would you choose Garza?' Look at that cast of characters. The evidence is [that] this man [Sean] is owed a debt. This man is the man who's dealing the drugs to the people in the shop and this man is the one who wants Shawn Lindsey's truck, and injected his arm with methamphetamine to get even, to take his revenge. This man. Are we going to make a deal with him to get the other guys?"

Neither of these passages describe a drug debt. While they describe drug evidence, they do not imply that the debt owed to Sean is connected to this drug evidence. Furthermore, we reiterate that Sean had no objection to paragraph 2 of the motion in limine, which requested that the court allow the admission of evidence that Sean and the

18

codefendants possessed illegal drugs and drug paraphernalia. Thus, "drug evidence" is specifically admissible under the motion.

As a final note, we point out that none of the alleged errors, even those that were unpreserved, violated the order in limine. We have reviewed the unpreserved statements and not one of them mentions drugs as the source of Lindsey's debt to Sean. Thus, even if we were to review Sean's unpreserved arguments, they would fail.

We conclude that there was no violation of the order in limine. Because there was no violation, there was no prosecutorial error.

2. *Questions regarding retention of an attorney*

Next, Sean argues that the prosecutor erred by asking questions about his retention of an attorney.

The Fourteenth Amendment affords a criminal defendant the right to employ counsel as an extension of his or her right to a fair trial. Accordingly, it is improper for the prosecutor, by questions or comments, to draw incriminating inferences from a defendant's exercise of this right. *State v. Dixon*, 279 Kan. 563, 591, 112 P.3d 883 (2005), *disapproved of on other grounds by State v. Wright*, 290 Kan. 194, 224 P.3d 1159 (2010).

During the testimony of Ana Garcia, Sean's fiancée, the prosecutor asked her, "Is it fair [to say] between the 16th and the 18th, before your fiancé had even been arrested you went and had a meeting with Kurt Kerns to talk about your representation, right?" Later, the prosecutor asked Garcia whether Sean had asked her to contact someone to get $30,000 or $40,000. Garcia answered yes, and the prosecutor asked, "And he's somebody who would have access to 30 or 40 grand to help pay for an attorney to get Dang Sean

19

out of jail, right?" Then, the prosecutor asked Garcia if she was supposed to try to help get codefendant Jason Jones an attorney and whether Sean was going to help pay for that attorney. Finally, the prosecutor asked, "So Dang Sean felt responsible enough that he was going to help Jason Jones also pay for the attorney?"

Sean argues that these questions were constitutionally impermissible under *Dixon*.

We agree that the prosecutor's questions regarding Sean's retention of an attorney contravene the protections we explicitly enumerated in *Dixon.* Because *Dixon* clearly holds that a prosecutor should not comment on or question a criminal defendant's right to employ counsel, we conclude that the comments regarding Sean's retention of an attorney fell outside of the wide latitude afforded to prosecutors. We caution that the remaining questions came very close to doing the same.

This moves the analysis to the second question in a prosecutorial error analysis. We now consider whether the questions prejudiced Sean's right to a fair trial.

As we noted in *Dixon*, a prosecutor's questions about the defendant's retention of counsel endangers that defendant's right to a fair trial. 279 Kan. at 591. However, under a prosecutorial error analysis, these questions only prejudiced Sean's right to a fair trial if they do not survive a constitutional harmless error test. While we find error, we conclude that it was harmless.

The error here came in the form of only two questions to the defendant's fiancée. Furthermore, defense counsel had already introduced evidence that Sean sought the services of an attorney before the jury heard it from the prosecutor. For these reasons, and in light of the great weight of evidence that otherwise implicates Sean in the charged

20

crimes, we conclude beyond a reasonable doubt that the error did not affect the outcome of this trial.

3. *Questions regarding alibi*

Sean's next prosecutorial error argument is that the prosecutor violated a court order when it asked Detective Harty if he was aware that Hernandez "talked about the need for Anthony Garza and Aaron Stricker to develop an alibi for the night that this all went down on January 11th?"

The "order" Sean references came about during the State's direct examination of Marcus Hernandez. The prosecutor asked Hernandez, "[W]hat did [Stricker] tell you that the Asians told him regarding an alibi?" Defense counsel objected on double hearsay grounds. The court responded, "Well, the question was what did [Stricker] tell you that the Asians told him regarding an alibi. I think it needs to be established what Asians we're talking about, specifically how many Asians were there, who were they, and establish that if it can be established." The prosecutor then resumed his questioning but was unable to establish who the "Asians" were. At that point, the judge sent the jury out and told counsel

> "[t]he thing that is troubling is the use of the plural word 'Asians' without any attribution. . . .[I]f [Hernandez] has something that he wants to say about the Asians told him this, the Asians told him that, the Asians said get an alibi, that is not going to be allowed."

When the jury returned, the prosecution resumed its questioning but abandoned any references to the alibi and thus never established which "Asian" was talking about an alibi or what was actually said regarding an alibi.

21

Stated more clearly, the order Sean refers to here is a directive from the trial court that the State could not procure any testimony that "the Asians" told Stricker and Garza to get an alibi unless at least one particular "Asian" could be identified. Consequently, if the prosecutor attempted to elicit the alibi statement without first identifying the person who said it, the State would have been in violation of the court's directive.

Even if we assume the prosecutor violated this directive, and the violation resulted in an action outside the wide latitude afforded prosecutors, we conclude that his actions did not prejudice Sean's right to a fair trial.

The prosecutor's statement was: "You're aware that he [Hernandez] talked about how Anthony Garza and Aaron Stricker talked about . . . the need for *Anthony Garza and Aaron Stricker* to develop an alibi for the night that this all went down on January 11th?" (Emphasis added.) Thus, this statement fails to suggest that Sean had anything to do with the crime on January 11th. Instead, it suggests that Garza and Stricker were the ones who needed an alibi. While it does reinforce the theory that a crime was committed on January 11th and suggests that Garza and Stricker were involved, it does nothing to suggest that Sean was a part of that crime. In fact, it tends to buttress the defense theory that Garza is the guilty party, not Sean. While it may speak to Garza's credibility, the other evidence and witnesses that corroborated his testimony outweighed any effect this could have had on a credibility determination. For this reason, the prosecutor's comment did not result in prejudice to Sean's trial, and therefore any assumed error was harmless.

4. *Credibility of a witness*

Finally, Sean argues that the prosecutor erred by commenting on the credibility of witness Anthony Garza during closing argument.

22

In *State v. Stone*, 291 Kan. 13, 19, 237 P.3d 1229 (2010), we explained the rules governing when prosecutors may offer their opinions on a witness' credibility:

"'In general, prosecutors may not offer juries their personal opinions as to the credibility of witnesses. Prosecutors have wide latitude, however, to craft arguments that include reasonable inferences to be drawn from the evidence. That latitude includes explaining to juries what they should look for in assessing witness credibility, especially when the defense has attacked the credibility of the State's witnesses. [Citations omitted.]'"

An example of a prosecutor who acted outside of that wide latitude comes from *State v. Elnicki*, 279 Kan. 47, 64, 105 P.3d 1222 (2005), where the prosecutor referred to the defendant as a "liar" and stated in her closing argument that "'the truth shows you beyond a reasonable doubt the defendant is guilty . . . .'" See also *State v. Pabst*, 268 Kan. 501, 507, 996 P.2d 321 (2000) (prosecutorial misconduct when the prosecutor told the jury that the defendant and defense counsel lied); *State v. Akins*, 298 Kan. 592, 607, 315 P.3d 868 (2014) (misconduct when the prosecutor explicitly stated that the witnesses and their statements were or were not "credible").

On the other hand, a prosecutor does not act outside the wide latitude afforded if he or she merely observes that some reasonable inference about witness credibility may be drawn from evidence introduced at trial. See *State v. Duong*, 292 Kan. 824, 831-32, 257 P.3d 309 (2011) (prosecutor's explicit comments about witnesses' credibility not improper because they were reasonable inferences based on the evidence at trial and prosecutor directed jury to that evidence); see also *State v. Davis*, 275 Kan. 107, 122-23, 61 P.3d 701 (2003) (prosecutor made reasonable inferences based on evidence in stating witness should be believed and that witness was more likely to tell truth in first police interview than second).

Here, the prosecutor's statement with which Sean takes issue is:

> "One of the agreements here is defendant will be required to testify truthfully at any and all proceedings in which he is subpoenaed. . . . This requirement shall apply when the defendant is called to the stand by the State or by any other party in the matter. Any question regarding the truthfulness of the testimony given by the defendant will be resolved by an independent magistrate."

Notably, both Sean and the State seem to consider this a reference to Garza's requirement to tell the truth, even though the prosecutor says "defendant," which would mean Sean, not Garza. To their credit, it does appear that the prosecutor meant Garza, based on his previous statement:

> "[STATE:] Anthony Garza came forward when he was arrested on the 20th and said, 'Look, guys, this is what I know.' . . . Well, think about his plea agreement. The part that wasn't read to you in Court the other day is this—Judge, can I ask if Mr. Peeler—okay. Sorry, I saw his eyes closed. I wanted to make sure you were awake.
>
> "JUROR PEELER: Yeah.
>
> "[STATE:] One of the agreements here is defendant will be required to testify truthfully at any and all proceedings in which he is subpoenaed."

It appears from the transcript that the prosecutor was referring to Garza and his plea agreement but lost his train of thought when he observed a juror with closed eyes and then started calling Garza the "defendant." Consequently, it is unclear exactly what the jury took from the prosecutor's statements.

If the jurors understood this to be a reference to Garza's plea agreement and his obligation to tell the truth, the prosecutor committed no error. The prosecutor never mentioned his own opinion about Garza's credibility, but simply stated a fact that was easily confirmed by Garza's own testimony and his oath to tell the truth. Garza confirmed, on the stand, that he had entered a plea agreement in exchange to testify. In *Duong* and *Davis*, the prosecutor went one step further by not only pointing to facts but then explicitly stating that the facts made the witness credible. 292 Kan. at 831-32; 275 Kan. at 122-23. Because here, the prosecutor simply stated a fact based on something already in evidence, the prosecutor was not improperly offering an opinion on Garza's credibility and was thus acting within the wide latitude afforded prosecutors.

If the jurors took the prosecutor's statement to mean that Sean had a plea agreement that required him to tell the truth, it is more likely that the comment amounted to error because such a statement is false. However, neither party considered this scenario or provided any argument on the issue. Thus this argument is not properly before this court. See *State v. Boleyn*, 297 Kan. 610, 633, 303 P.3d 680 (2013) (arguments not briefed on appeal are deemed waived and abandoned).

We conclude that the prosecutor did not act outside of the wide latitude afforded prosecutors when the prosecutor stated that Garza would be required to tell the truth at any proceedings because of the plea agreement. Thus, there was no prosecutorial error.

In sum of this four-part issue, prosecutorial error occurred when the prosecutor made comments regarding Sean's retention of an attorney and we assume error in the prosecution's comments regarding the alibi. However, because both errors were harmless, there is no reversible error.

*Erroneous Admission of Bad Acts Evidence*

Sean presents four arguments in this issue: (1) the trial court failed to make findings on the record that it was required to make before admitting prior bad acts evidence under K.S.A. 2016 Supp. 60-455; (2) the prior bad acts evidence was either irrelevant or the probative value of the evidence was outweighed by its prejudicial effect; (3) the limiting instruction given by the trial court in regard to the prior bad acts evidence was erroneous; and (4) the limiting instruction did not cure the lack of findings on the record.

Because we conclude that Sean did not preserve this issue for appeal, we do not reverse on these grounds.

"K.S.A. 60-404 dictates that evidentiary errors shall not be reviewed on appeal unless a party has lodged a timely and specific objection to the alleged error at trial." *King*, 288 Kan. at 349.

"[U]nlike a failure to object to evidence, a failure to object to an instruction does not bar appellate review of the instruction. It does, however, raise the persuasive bar the complaining party must hurdle on appeal; the appellate court must be convinced the instruction is clearly erroneous." *State v. Breeden*, 297 Kan. 567, 581, 304 P.3d 660 (2013).

First, Sean argues that the court was required to make certain findings under K.S.A. 2016 Supp. 60-455 and *State v. Gunby*, 282 Kan. 39, Syl. ¶ 3, 144 P.3d 647 (2006), before it could admit the following evidence: certain testimony from Bernhard, a statement made during the State's closing argument, numerous text messages, and a

detective's testimony that Sean allegedly had possession of a firearm that had been reported stolen.

Sean did not object to the introduction of the text messages or the statement in the closing argument. Sean did object to some of Bernhard's testimony, but he did so on grounds of hearsay, cumulative evidence, and that some of her testimony was not in dispute. At no point did Sean challenge the lack of *Gunby* findings. Because Sean either failed to object or objected on different grounds than he raises on appeal, this argument is not properly before this court.

Sean's second argument that the evidence was more prejudicial than it was probative was likewise not preserved by a timely objection on this ground. Accordingly, this argument cannot be raised for the first time on appeal.

Sean's third and fourth arguments purport to take issue with the limiting instruction. He contends that the instruction did not cure the trial court's error in failing to make *Gunby* findings. Additionally, he contends the instruction itself was erroneous because it allowed the jury to consider prior crimes evidence for motive and the relationship of the parties without the district court having made the required *Gunby* findings.

The trial court provided the following limiting instruction with regard to K.S.A. 60-455 evidence: "In this case, ladies and gentlemen, evidence has been admitted tending to prove the defendant committed crimes other than the present crimes charged. This evidence may be considered solely for the purpose of proving the defendant's motive and the relationship of the parties."

While this court can address challenges to jury instructions not raised below, we observe that neither of Sean's contentions actually concern the instruction itself. Rather, they are veiled continuations of his arguments that the admission of the evidence was erroneous and that the court failed to make *Gunby* findings. Accordingly, Sean cannot make these arguments on appeal. See *Breeden*, 297 Kan. at 580 (explaining this court would not "allow [a party] to merely disguise an evidentiary argument as an instructional issue" in order to present an unpreserved argument on appeal); *State v. Rojas-Marceleno*, 295 Kan. 525, 538, 285 P.3d 361 (2012) (refusing to review an unpreserved issue that was framed as an instructional error).

We are unable to reach the merits of Sean's prior bad acts arguments because he failed to properly preserve them for review and sought to reframe unpreserved issues as instructional error.

*Erroneous Admission of Hearsay Statements*

Next, Sean argues the trial court erred by admitting certain hearsay statements under the declarations against interest exception.

"This court reviews a trial court's determination that hearsay is admissible under a statutory exception . . . for an abuse of discretion." *State v. Summers*, 293 Kan. 819, 827, 272 P.3d 1 (2012). Judicial action constitutes an abuse of discretion if it

> "'(1) is arbitrary, fanciful, or unreasonable, *i.e.*, if no reasonable person would have taken the view adopted by the trial court; (2) is based on an error of law, *i.e.*, if the discretion is guided by an erroneous legal conclusion; or (3) is based on an error of fact, *i.e.*, if substantial competent evidence does not support a factual finding on which a prerequisite conclusion of law or the exercise of discretion is based. [Citations omitted.]'" *State v. Shank*, 304 Kan. 89, 92, 369 P.3d 322 (2016).

28

K.S.A. 2016 Supp. 60-460 bars admission of "[e]vidence of a statement which is made other than by a witness while testifying at the hearing, offered to prove the truth of the matter stated" unless it falls into one of the exceptions outlined in the statute. One of these exceptions is the declarations against interest exception, which is defined as

"a statement which the judge finds was at the time of the assertion so far contrary to the declarant's pecuniary or proprietary interest or so far subjected the declarant to civil or criminal liability or so far rendered invalid a claim by the declarant against another or created such risk of making the declarant an object of hatred, ridicule or social disapproval in the community that a reasonable person in the declarant's position would not have made the statement unless the person believed it to be true." K.S.A. 2016 Supp. 60-460(j).

Marcus Hernandez testified for the State and described a conversation that he overheard between Stricker and Garza. The trial court ruled that many of the statements that Hernandez recounted were admissible under the declarations against interest exception. Sean argues that Stricker and Garza were coparticipants in this crime, and under *State v. Myers*, 229 Kan. 168, 174, 625 P.2d 1111 (1981), hearsay statements by coparticipants may not come into evidence under the declarations against interest exception. Specifically, Sean takes issue with the admission of the following testimony:

- Hernandez' testimony that, upon hearing that a body was found, Stricker said: "I hope they didn't kill that fool."

- Hernandez' testimony that Stricker said he went over to Lindsey's house, picked him up, and took him to Sean's shop.

29

- Hernandez' testimony that Stricker said there were Asians at the shop and a particular Asian was the "supposed boss."

- Hernandez' testimony that Stricker said he and Garza took Lindsey to Sean's shop because of money.

- Hernandez' testimony that Garza said he had zip-tied Lindsey to a chair.

- Hernandez' testimony that, after getting a phone call, Stricker said: "We got to go. The weakest link has been caught."

- Hernandez' testimony that, after Stricker said his mother had informed him that a body was found, Stricker was not surprised at the news, but skeptical.

- The prosecutor's question to Hernandez "what did SB [Stricker] tell you that the Asians told him regarding an alibi?"

- Hernandez' testimony that "there was talk about, you know, just . . . a certain Asian guy out at the Asian group that's just . . . was just a bad-ass" in response to the court's question regarding whether Stricker had ever told Hernandez the names of any of the Asians.

Before addressing whether the testimony was erroneously admitted as hearsay declarations against interest, we first rule out the testimony that did not actually describe hearsay statements.

First, we conclude that Stricker's statements "I hope they didn't kill that fool," "[w]e got to go," and "[t]he weakest link has been caught," were not admitted to prove Stricker's hopes, his need to leave a place, or that someone had been caught. Rather, they appear to be an attempt to show that Stricker had knowledge of the crime and a guilty conscience. As the statements were not admitted to prove the truth of the matter asserted, they do not constitute hearsay.

Second, Hernandez' testimony that Stricker was not surprised but skeptical appears to be Hernandez' own perception of Stricker's emotions on the day in question. Under these circumstances, we do not regard Hernandez' description of Stricker's apparent emotional state as an out-of-court statement. See *Markgraf v. State*, 12 P.3d 197, 198 (Alaska App. 2000) (citing John W. Strong *et al*., *McCormick on Evidence* [5th ed. 1999], § 250, Vol. 2, pp. 108-109) (explaining that "[c]ourts routinely hold that testimony concerning a person's apparent mental state-testimony that the person appeared angry, fearful, agitated, happy, or excited-is not hearsay" because the person does not intend the "demeanor to be an assertion about his mental state").

Finally, we observe that the State's question to Hernandez regarding an alibi was not a statement, but a question posed by counsel. As the prosecutor abandoned the question without receiving an answer, no hearsay statement was admitted.

These five excerpts of testimony were not hearsay statements and were thus admissible without falling into any exception. This leaves the following testimonies for this court's review:

31

- Garza's statement that he zip-tied Lindsey to a chair.

- Stricker's statement that he went over to Lindsey's house, picked him up, and took him to Sean's shop.

- Stricker's statement that he and Garza took Lindsey to Sean's shop because of money.

- Stricker's statement that there were Asians at the shop and a particular Asian was the "supposed boss."

- Hernandez' testimony that "there was talk about, you know, just . . . a certain Asian guy out at the Asian group that's just . . . was just a bad-ass" in response to the court's question regarding whether Stricker had ever told Hernandez the names of any of the Asians.

We decline to address the admission of each statement in turn as it will have no effect on our ultimate conclusion. Even if we assume all of the testimony was erroneously admitted, our analysis below demonstrates its admission amounted to harmless error.

When determining whether an alleged violation of statutory evidentiary limitations was error, we apply the harmless error standards set out in K.S.A. 2016 Supp. 60-261 and K.S.A. 60-2105. This standard provides that we must consider "whether a reasonable

probability exists that the error affected the outcome of the trial in light of the record as a whole." *State v. Betancourt*, 299 Kan. 131, 144, 322 P.3d 353 (2014). The burden of persuasion lies with the party benefitting from the introduction of the evidence. 299 Kan. at 144.

Review of the record demonstrates that the substance of the majority of the challenged testimony was cumulative and established through other evidence. First, Bernhard, Coleman, and Garza testified that Lindsey owed Sean money. Second, the State offered a series of text messages in which Sean repeatedly told Lindsey to get him his money and threatened to take his truck and "crack . . . heads." Third, Garza testified that he and Stricker picked up Lindsey and took him to the shop. Sean's text messages confirm that he sent men to collect from Lindsey. Fourth, Garza and Coleman both testified that Sean and Air, who both appear to be of Asian descent and were depicted in photos given to the jury, were at the shop on January 11. Fifth, Coleman testified that Sean was the owner of the shop—thus implying that he was the boss. Finally, Garza testified that he zip-tied Lindsey to the chair.

The only noncumulative evidence in the challenged testimony was the reference to one of the "Asians" as a "bad-ass." However, this one passing comment, when coupled with the other challenged cumulative evidence, could not have reasonably affected the outcome of the trial in light of the great weight of evidence implicating Sean in the crime. Any error in the admission of this challenged evidence amounts to harmless error.

The statements that Sean challenges as inadmissible hearsay were either not hearsay statements or their admission was harmless. This argument fails.

33

*Motion for Mistrial*

Sean argues the trial court should have granted his motion for mistrial because the prosecutor introduced inadmissible gang evidence in violation of an agreement between the parties. The State acknowledges that it agreed not to introduce evidence of gang affiliation but responds that the gang reference that entered evidence did not amount to reversible error.

This court recently articulated the law and standard of review applicable to a motion for mistrial:

> "'Under K.S.A. 22-3423(1)(c), a trial court may declare a mistrial if there was prejudicial conduct either inside or outside the courtroom that makes it impossible for the trial to proceed without injustice to either the defendant or the prosecution. This statute creates a two-step process. First, the trial court must determine if there was some fundamental failure of the proceeding. If so, the trial court moves to the second step and assesses whether it is possible to continue without an injustice. In other words, the trial court must decide if the prejudicial conduct's damaging effect can be removed or mitigated by an admonition, jury instruction, or other action. If not, the trial court must determine whether the degree of prejudice results in an injustice and, if so, declare a mistrial. *State v. Ward*, 292 Kan. 541, 550, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012); see *State v. Race*, 293 Kan. 69, 80, 259 P.3d 707 (2011).

> "'In *Ward*, our court articulated this standard by dividing the appellate court's abuse of discretion inquiry into two parts, asking: (1) Did the trial court abuse its discretion when deciding if there was a fundamental failure in the proceeding? and (2) Did the trial court abuse its discretion when deciding whether the conduct resulted in prejudice that could not be cured or mitigated through jury admonition or instruction, resulting in an injustice? 292 Kan. at 551.' *Waller*, 299 Kan. at 725-26." *State v. Moyer*, 302 Kan. 892, 906, 360 P.3d 384 (2015).

34

In the present case, Garza provided the following testimony during the State's direct examination:

"[PROSECUTOR:] Mr. Kerns also mentioned something in his opening about chatter going on over at the jail between you and some guy named Caesar?

"[GARZA:] Caesar Reyes.

"Q. Caesar Reyes?

"A. Yes.

"Q. What have you told Caesar Reyes about this case?

"A. I actually never told that man nothing about this case. I was sitting in chapel—he was actually in the same pod, in the same section as Dang Sean. He asked me what I was here on, I said aggravated kidnapping. And then he was actually to the left of me in chapel, and he was like, oh, man, I'm—I know this guy, this Asian dude, he has a big A on his back saying he's a shock collar for the Asian Boy Crips. And that he's in here on agg kidnapping, first-degree murder, and a gun charge. I was like—I said Dang Sean? And said he yeah. And I was like I'm on the same case. He was like, oh, oh."

Defense counsel moved for a mistrial after the prosecutor concluded the direct examination of Garza, arguing that the parties' agreement that there would be no discussion of gang affiliation had been violated.

The trial court denied the motion for mistrial reasoning there was no deliberate violation of the parties' agreement. The judge admonished the parties not to make any references to gangs, but Sean declined his offer to give a limiting instruction or admonishment to the jury.

*Step 1: Did the trial court abuse its discretion in deciding whether there was a fundamental failure?*

Under the first step of the mistrial analysis, it is not clear whether the trial court considered the admission of the gang reference a fundamental failure in the proceeding. The court did note that gang references can be very prejudicial, depending on the context, but then commented that in this instance, the comment was made in passing by a witness "in the middle of a bunch of other things that he said" and was not a deliberate violation of the parties' agreement. From these comments, it seems the court may have been implying that there was no fundamental failure.

However, the trial judge went on to address the second step in considering a motion for mistrial when he offered to give a jury admonishment or limiting instruction. Because this step is necessary only when there was a fundamental failure in the trial, we assume the trial court determined the gang reference constituted a fundamental failure in the proceedings.

Sean presents a number of arguments to support the trial court's conclusion that there was a fundamental failure in the proceeding: the prosecution violated an agreement that it would not introduce evidence of gang affiliation; any references to gangs were not relevant and thus inadmissible under *State v. Goodson*, 281 Kan. 913, 135 P.3d 1116 (2006); and the statements were inadmissible hearsay. The most compelling, however, is that the prosecution violated the parties' agreement that no evidence of gang affiliation would be admitted at trial. The State acknowledges this agreement but argues that it is "a stretch" to consider the admission of Reyes' statements a fundamental failure because, but for the agreement, gang evidence may have been admissible. Furthermore, the State argues, the prosecutor did not desire the admission of this evidence. Rather, the reference was "blurted out" by a witness. Because the State's witness testified to

36

Sean's gang affiliation nonetheless, we conclude that the trial court did not abuse its discretion in apparently concluding this was a fundamental failure in the proceedings.

> *Step 2: Did the trial court abuse its discretion in deciding any potential prejudice could be mitigated?*

In the second step of the mistrial analysis, we decide whether the trial court abused its discretion in concluding that any potential prejudice from the fundamental failure could be mitigated. *Moyer*, 302 Kan. at 907-08.

Here, the judge admonished the parties not to mention any more gang affiliations and asked Sean if he would like a limiting instruction or jury admonishment to negate any potential prejudice. Sean denied a jury admonishment or limiting instruction.

We conclude that the trial court did not abuse its discretion in deciding that any prejudice could be mitigated. This testimony amounted to one passing gang reference made by one witness and was never highlighted or dwelled upon by the prosecution. The court mitigated any potential prejudice with an admonishment to the parties and an offer to provide a limiting instruction or jury admonishment. Consequently, the trial court acted within its discretion when it denied the motion for mistrial.

*Limitation on Cross-examination*

Sean argues that the trial judge's decision to limit cross-examination of a State's witness precluded him from asking pertinent questions that went to the witness' credibility. Sean contends this limitation resulted in a violation of his rights under the Confrontation Clause.

Even if we assume the limitation was erroneous, our analysis below demonstrates that reversal is not required.

When an error infringes upon a party's federal constitutional right, a court will declare a constitutional error harmless when the party benefiting from the error persuades the court "beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record." *Ward*, 292 Kan. at 569.

In the present case, Coleman testified for the State. During cross-examination, defense counsel asked about a statement Coleman made to a detective regarding an episode of *20/20* that Coleman had watched. The prosecutor objected to this question based on relevance. The trial judge sustained the objection and explained that the testimony would tend to confuse the issues or mislead the jury.

After redirect, the jury was dismissed for the day and the judge allowed defense counsel to explain what testimony he was trying to elicit from the witness. Referencing Detective Robert Reichenberger's report of an interview with Coleman, defense counsel explained:

> "The sentence I wanted to ask him about was whether this person advised the Detective Reichenberger that the—this is how he felt, that he was being made to say something he didn't know anything about. That's what I wanted to get out on cross. That Will advised Reichenberger that he felt like he was being made to say something he didn't know anything about."

The prosecutor responded by reading aloud this portion of the interview. In that portion of the interview, the Detective explained that Coleman told him

"'he had seen a shown [*sic*] on *20/20* called *Confessions*, that he had learned of five young men who had been implicated in being involved in a criminal investigation and who had been convinced by the detectives to plead guilty to something they hadn't actually done but did so because they had been influenced by detectives to say that something happened when, in fact, it hadn't.

"[Coleman] advised me that this is how he felt, that he was being made to say something that he did not know anything about. I asked Will if he said anything that is untrue, and he advised me that, no, he did not. I advised Will if he hadn't said anything that wasn't true, that he wasn't, in fact, guilty of the same behavior as the five males. And about that time [Coleman] made the statement, quote, 'I'm going to die, [Sean]'s going to kill me. I'm frightened for my life because I'm jeopardizing [Sean]'s freedom,' end quote."

After the prosecutor read this report, the trial judge reiterated his earlier decision to sustain the objection, noting that the *20/20* reference was "vague, ambiguous . . . [and] misleading."

We disagree with the trial judge's characterization of the *20/20* reference because the credibility of a participant in the crime was potentially important to the defense. The reliability of a witness is an essential jury consideration, one upon which guilt or innocence may ultimately rest. See *State v. Francis*, 282 Kan. 120, 149-50, 145 P.3d 48 (2006) (credibility evidence may be considered as exculpatory evidence). However, despite its relevance to credibility, we observe that the *20/20* reference offered no substantive or exculpatory evidence. Thus, given the overwhelming evidence in this case, including evidence which corroborated Coleman's testimony, we conclude that, beyond a reasonable doubt, the exclusion of the *20/20* reference did not affect the outcome of this trial. The admission of this testimony does not constitute reversible error.

*Improper Sympathy Evidence*

Sean next argues that during direct examination, the prosecutor elicited improper sympathy evidence from Lindsey's mother, Anita Lindsey (Anita). However, Sean has failed to preserve this issue for review.

"K.S.A. 60-404 dictates that evidentiary errors shall not be reviewed on appeal unless a party has lodged a timely and specific objection to the alleged error at trial." *King*, 288 Kan. at 349.

Defense counsel lodged no objections during any of Anita's testimony.

Sean argues that this court should review this issue even though he made no contemporaneous objection because this court reviewed similar issues in *State v. Kunellis*, 276 Kan. 461, 477-49, 78 P.3d 776 (2003), and *State v. Carter*, 270 Kan. 426, 441-42, 14 P.3d 1138 (2000), even though there was no contemporaneous objection in either case.

However, in *Kunellis* and *Carter*, we reversed and remanded both cases on issues other than sympathy evidence and addressed the sympathy evidence only to guide the trial court on remand. *Kunellis*, 276 Kan. at 478-79, 489; *Carter*, 270 Kan. at 441-42. These cases do not stand for the proposition that this court should review unpreserved sympathy evidence as the basis for reversible error, as Sean implies.

Alternatively, Sean argues that this court should review this issue "to prevent the denial of [his] fundamental right to a fair trial free from irrelevant and prejudicial sympathy evidence, meant only to arouse the passions of the jury." In support of this assertion, Sean cites one Kansas Court of Appeals case in which the court held that even

if it were to consider the party's unpreserved constitutional argument, it would fail on the merits. *State v. Stevens*, 36 Kan. App. 2d 323, 338, 138 P.3d 1262 (2006). Thus, Sean provides no support for why the court must review this issue to prevent the denial of a fundamental right.

Finally, Sean argues that review is necessary to serve the ends of justice because he was "actually harmed by the introduction of this inadmissible evidence, in combination with the other errors of the trial court and the prosecutorial misconduct that saturated this trial." In support, Sean cites *State v. Holt*, 285 Kan. 760, 769-70, 175 P.3d 239 (2008).

Sean's reliance on *Holt* is misplaced. In *Holt*, this court declined to conclude that an unpreserved argument fell into the "ends of justice" exception to the contemporaneous objection rule because the party failed to show that the alleged error actually caused harm. 285 Kan. at 770. Sean urges this court to conclude that *Holt* also stands for the inverse: that this court *will* review an unpreserved argument when the party can show that an alleged error *did* cause harm. But *Holt* does not stand for this proposition and we decline to adopt Sean's interpretation. Thus, Sean presents no support for his assertion that this court must review the issue to serve the ends of justice.

Because defense counsel failed to object to this testimony at trial, and Sean offers no persuasive support for his arguments that this court should nonetheless review this argument, Sean fails to present grounds for reversal.

*Cumulative Error*

Sean finally argues that cumulative error resulted in an unfair trial.

41

When a party argues that the cumulative impact of alleged errors is so great that they result in an unfair trial, this court aggregates all the errors and, even if those errors individually would be considered harmless, analyzes whether their cumulative effect is so great that they collectively cannot be determined to be harmless. *State v. King*, 297 Kan. 955, 986, 305 P.3d 641 (2013). In undertaking such an analysis, this court reviews the entire record and exercises unlimited review. *State v. Cruz*, 297 Kan. 1048, 1073-74, 307 P.3d 199 (2013). One error is insufficient to support reversal under the cumulative error doctrine. *State v. Novotny*, 297 Kan. 1174, 1191, 307 P.3d 1278 (2013).

As discussed above, the prosecutor erred in asking questions about Sean's retention of an attorney, and we have assumed error in the prosecution's questions regarding an alibi and the trial court's admission of certain hearsay testimony and limitation of cross-examination of one State's witness. None of these errors were independently harmful in nature. Furthermore, overwhelming evidence implicated Sean in these crimes, including eyewitness testimony, physical evidence, and Sean's own text messages. The harmless nature of the error and assumed errors, coupled with the strength of the State's case, compels our conclusion that the cumulative effect of the errors is not so great as to warrant reversal.

The district court is affirmed.

ROSEN, J., not participating.

MICHAEL J. MALONE, Senior Judge, assigned.[1]

---

[1] **REPORTER'S NOTE:** Senior Judge Malone was appointed to hear case No. 114,417 vice Justice Rosen under the authority vested in the Supreme Court by K.S.A. 20-2616.